**RAILROAD YARDMASTERS
OF AMERICA**

v.

**Robert O. HARRIS, Chairman, National
Mediation Board, et al., Appellants.**

No. 82–2468.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 13, 1983.

Decided Nov. 10, 1983.

As Amended Nov. 16, 1983.

John C. Hoyle, Atty., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., Anthony J. Steinmeyer, Atty., Dept. of Justice and Ronald M. Etters, General Counsel, National Mediation Board, Washington, D.C., were on brief, for appellants.

Michael S. Wolly, Washington, D.C., with whom Edward J. Hickey, Jr., Washington, D.C., was on brief, for appellee.

Before WALD and EDWARDS, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court· filed by Circuit Judge HARRY T. EDWARDS.

Dissenting opinion filed by Circuit Judge WALD.

1. 45 U.S.C. § 154 (1976).

HARRY T. EDWARDS, Circuit Judge:

This case presents the issue whether section 4 of the Railway Labor Act [1] permits a single member of the three-person National Mediation Board ("the Board") to act for the Board pursuant to a validly issued delegation order at a time when there are two vacancies on the Board.

The National Mediation Board is responsible for administering provisions of· the Railway Labor Act.[2] The Board seeks to maintain labor peace in the railroad and airline industries primarily by mediating contract disputes, resolving representation disputes and administering arrangements for the arbitration of disputes under collective bargaining agreements. On June 1, 1982, the Board had only two members in office. In anticipation of the resignation of one of the members, the Board issued a delegation order authorizing the other member to act for the Board. The first member then resigned. During the subsequent period, when only one member remained in office, a dispute arose between the Railroad Yardmasters of America ("RYA") and the Yardmasters Steering Committee ("YSC") concerning which organization would represent the yardmasters of the Union Pacific Railroad Company. The Board investigated the dispute, conducted an election, considered and denied several protests filed by RYA, and finally certified YSC as the organization designated and authorized to represent the yardmasters. RYA subsequently brought suit in the District Court seeking to have the Board's orders invalidated. The District Court held that the orders had been issued in violation of the Board's quorum requirement and enjoined the Board and the one member then in office from enforcing the orders.

We conclude that the District Court misconstrued applicable law by failing to give effect to the provisions of the Railway Labor Act that authorize an individual mem-

2. 45 U.S.C. §§ 151–163, 181–188 (1976 & Supp. V 1981).

ber to exercise the powers of the Board pursuant to a validly issued delegation order. Accordingly, we reverse.

## I. BACKGROUND

### A. *The Statutory Framework*

The National Mediation Board was established as an independent agency in the executive branch of the Government on June 21, 1934, by an act of Congress amending the Railway Labor Act.[3] Section 4 of the Railway Labor Act, 45 U.S.C. § 154 (1976), contains the Board's enabling provisions, several of which are at issue in this case. The first subdivision of section 4 deals with the composition of the Board, the effect of vacancies, and the number of members required for a quorum. Specifically, the first subdivision provides in pertinent part that:

There is established, as an independent agency in the executive branch of the Government, a board to be known as the "National Mediation Board", to be composed of three members appointed by the President, by and with the advice and consent of the Senate, not more than two of whom shall be of the same political party.... Vacancies in the Board shall not impair the powers nor affect the duties of the Board nor of the remaining members of the Board. Two of the members in office shall constitute a quorum for the transaction of the business of the Board.

---

**3.** Act of June 21, 1934, ch. 691, § 4, 48 Stat. 1185, 1193 (codified as amended at 45 U.S.C. § 154 (1976)).

**4.** Justice Harlan succinctly described the dispute resolution procedures of the Railway Labor Act in *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969):

The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its

45 U.S.C. § 154, First (1976). The fourth subdivision of section 4 authorizes the Board to delegate its powers and duties:

The Mediation Board is authorized by its order to assign, or refer, any portion of its work, business, or functions arising under this chapter or any other Act of Congress, or referred to it by Congress or either branch thereof, to an individual member of the Board or to an employee or employees of the Board to be designated by such order for action thereon, and by its order at any time to amend, modify, supplement, or rescind any such assignment or reference. All such orders shall take effect forthwith and remain in effect until otherwise ordered by the Board. In conformity with and subject to the order or orders of the Mediation Board in the premises, [and] such individual member of the Board or employee designated shall have power and authority to act as to any of said work, business, or functions so assigned or referred to him for action by the Board.

45 U.S.C. § 154, Fourth (1976) (brackets in original).

The Board has three major responsibilities. The first is to mediate disputes over rates of pay, rules, or working conditions that arise between rail and air carriers and organizations representing their employees.[4] The second is to investigate representation disputes and certify employee organizations as representatives of crafts or classes of carrier employees. The third is to administer arrangements for the arbitra-

---

services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10.

tion of disputes concerning the interpretation of collective bargaining agreements.

The present case arises out of a representation dispute. The key provisions dealing with such disputes are contained in the fourth and ninth subdivisions of section 2 of the Railway Labor Act. Section 2, Fourth of the Railway Labor Act provides in pertinent part that: "Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter." 45 U.S.C. § 152, Fourth (1976). Section 2, Ninth of the Act sets forth the duties of the Board to investigate, upon request, any representation dispute among employees and to certify to contesting parties and the carrier the name or names of individuals or organizations who are the authorized and designated bargaining representatives. The Board is expressly authorized to use a secret ballot election procedure or any other appropriate means, such as a check of valid authorization cards, that will assure a free and uncoerced exercise of the employees' right to choose representatives. If the Board chooses to conduct a secret ballot election, the designation of eligible voters and establishment of rules to govern the election are the responsibilities of the Board. Once the determination of the employees' choice of representative, if any, has been made, the Board issues a written certification of the outcome of its investigation. If a bargaining representative is certified by the Board, the carrier is under a legally enforceable obligation to treat with that representative for the purposes of the Act.[5]

### B. The Facts

The facts in this case are not in dispute. From June 1 until October 12, 1982, the National Mediation Board had only one member in office. This condition arose through the following sequence of events. As of August 31, 1981, the Board was fully manned with three members in office: George S. Ives, Robert O. Harris and Robert J. Brown.[6] On September 1, 1981, Member Ives retired.[7] On June 1, 1982, at 10:00 a.m., Members Harris and Brown executed the following Order:

> Pursuant to Section 4, Fourth of the Railway Labor Act, 45 U.S.C. § 154, Fourth, the undersigned Members of the National Mediation Board hereby do authorize and empower Robert O. Harris, a Member of the National Mediation Board, to exercise without further authorization all official actions whatsoever on behalf of the National Mediation Board under the Railway Labor Act or any other authority. This Order will become effective on June 1st 10:05 A.M. and will expire upon the taking of office of a new Board Member, or upon revocation by Board Member Robert J. Brown.[8]

Later that day Member Brown resigned, leaving Member Harris as the only remaining member. That condition continued until October 12, 1982, when Member Ives' successor finally took office.[9] Throughout

5. For a detailed discussion of the National Mediation Board's role in resolving representation disputes, see Eischen, *Representation Disputes and Their Resolution in the Railroad and Airline Industries,* in THE RAILWAY LABOR ACT AT FIFTY 23 (C. Rehmus ed. 1976).

6. *See* NATIONAL MEDIATION BOARD, FORTY-SEVENTH ANNUAL REPORT ii, iv (for the fiscal year ended Sept. 30, 1981).

7. *Id.*

8. Joint Appendix ("J.A.") 12.

9. On February 4, 1982, President Reagan nominated George S. Roukis to replace George S. Ives as a member of the National Mediation Board. 128 CONG.REC. S447 (daily ed. Feb. 4, 1982). The Senate confirmed Mr. Roukis' nomination on March 15, 1982, but vitiated that action on the same date. 128 CONG.REC. S2108 (daily ed. Mar. 15, 1982). President Reagan withdrew Mr. Roukis' nomination on June 14, 1982. 128 CONG.REC. S6768 (daily ed. June 14, 1982). On September 17, 1982, President Reagan nominated Walter C. Wallace to replace George S. Ives as a member of the National Mediation Board. 128 CONG.REC. S11,793 (daily ed. Sept. 17, 1982). The Senate confirmed Mr. Wallace's nomination on October 1, 1982. 128 CONG.REC. S13,411 (daily ed. Oct. 1, 1982). Mr. Wallace took office on October 12, 1982. Brief for Appellants at 7 n. 4; Brief for Appellee at 3, 7.

the period from June 1 until October 12, 1982, Member Harris acted for the Board pursuant to the delegation order.[10]

During the period when Harris was the lone member, the National Mediation Board resolved a representation dispute that arose between the Railroad Yardmasters of America and the Yardmasters Steering Committee. From 1935 until 1982, RYA had represented persons employed as yardmasters at the Union Pacific Railroad Company. On June 10, 1982, YSC filed an application with the Board for a determination of whether the yardmaster employees of the Union Pacific Railroad Company wished to have YSC replace RYA as the employees' lawful bargaining agent.

Consistent with normal practice, an agent of the Board was assigned to investigate the RYA/YSC matter. This investigation disclosed a legitimate representation dispute involving the yardmasters. Accordingly, a secret ballot election was held to determine the employees' choice of a bargaining agent. Before the ballots were counted, RYA submitted four letters of protest to the Board. The protests alleged that YSC had failed to comply with the requirements of the Labor-Management Reporting and Disclosure Act of 1959; that YSC lacked the intent and ability to represent the yardmasters of the Union Pacific Railroad Company if certified; that YSC's campaign literature contained impermissible campaign propaganda; and that the Union Pacific Railroad Company unlawfully

had supported YSC and interfered with the election campaign.[11] In a letter dated September 7, 1982, the Board denied the protests as baseless and indicated that the ballots would be counted as scheduled. The letter was signed by the Executive Secretary "[b]y direction of the NATIONAL MEDIATION BOARD." [12]

The ballots were then counted, with a result of 138 votes for YSC and 42 votes for RYA. Accordingly, on September 14, 1982, the Board issued an order certifying that YSC was designated and authorized to represent the craft or class of yardmasters of the Union Pacific Railroad Company. The certification order was signed by the Executive Secretary "[b]y order of the NATIONAL MEDIATION BOARD." [13]

### C. The Proceedings in the District Court

On September 24, 1982, RYA filed a complaint for declaratory judgment, injunction and other specific relief in the District Court, seeking invalidation of, and an injunction against, the representation orders issued on September 7th and 14th by the National Mediation Board [14] on the ground that they had been issued at a time when the Board lacked a quorum for the transaction of its business. RYA also filed a motion for preliminary and permanent injunctive relief, requesting that the Board and Member Harris be enjoined from giving any force and effect to the representation orders. On October 4, 1982, the National

**10.** An almost identical sequence of events occurred in 1947. On January 31, 1947, when there was one vacancy on the Board, Members Douglass and Schwartz adopted a resolution authorizing Member Douglass "to perform all of the work, business or functions of the National Mediation Board arising under the Railway Labor Act, as amended." Minutes of the January 31, 1947 Session of the National Mediation Board, *reprinted in* Record at 2 (Attachment 10). Member Schwartz retired later that day. Official Notice, National Mediation Board (Jan. 31, 1947), *reprinted in* Record at 2 (Attachment 11). During the two-month period between January 31, 1947, and April 1, 1947, when a new member took office, Member Douglass acted for the Board pursuant to the delegation resolution. *See* Affidavit of Rowland K. Quinn, Jr., Executive Secretary, Nation-

al Mediation Board ¶ 6, at 3 (Oct. 4, 1982), *reprinted in* J.A. 15. The Board's actions during that period included closing 28 representation cases, ordering 17 elections, and recommending the establishment of an Emergency Board to President Truman. Memorandum from Sheldon Kline, Research Director, to Rowland K. Quinn, Jr., Executive Secretary, National Mediation Board (Sept. 30, 1982), *reprinted in* Record at 2 (Attachment 13).

**11.** 9 NMB No. 146, *reprinted in* J.A. 7–8.

**12.** *Id.*

**13.** 9 NMB No. 149, *reprinted in* J.A. 9–10.

**14.** *See* notes 11–13, *supra,* and accompanying text.

Mediation Board and Member Harris filed a cross-motion for summary judgment. The District Court held a hearing on October 6th. On October 8th, the District Court filed a Memorandum Opinion and Order granting RYA's motion for permanent injunction and denying the Government's motion for summary judgment. In its Memorandum Opinion, the District Court held that the representation orders were invalid because the Board lacked a quorum when it issued them.[15] The District Court also indicated that, for the vacancies provision to be consistent with the quorum provision, the vacancies provision must be interpreted to apply solely to the situation in which there is only one vacancy on the Board.[16] Furthermore, the District Court held that the delegation provision was intended to enable the Board to operate more efficiently, not to enable it to function with only one Board member in contravention of the quorum provision.[17] Finally, the District Court ruled that the Board was without power on June 1, 1982, to delegate its authority over the RYA/YSC matter because that case was not yet before the Board and did not come before the Board until after Member Brown's resignation.[18]

## II. ANALYSIS

This case requires us to construe the relevant provisions of section 4 of the Railway Labor Act, 45 U.S.C. § 154 (1976), and in particular to determine the scope of the delegation, vacancies, and quorum provisions. We must then apply those provisions to the circumstances of this case to determine what powers the Board and Member Harris possessed during the period when there were two vacancies on the Board and, ultimately, to determine whether the two challenged orders were validly issued. Before reaching the merits of this case, however, we must address an issue that the Government presents for the first time on

appeal: whether RYA, having failed to raise the issue in administrative proceedings before the Board, should be precluded in court from raising a question concerning the Board's competency to act.

### A. Waiver

■ The Government, of course, should have raised the issue of waiver for failure to exhaust administrative remedies in the first instance in the District Court. See *Bituminous Coal Operators' Association v. Secretary of Interior,* 547 F.2d 240, 244 (4th Cir.1977) (defense of failure to exhaust administrative remedies is not jurisdictional and should be raised in first instance in district court rather than on appeal); *Parker v. United States,* 448 F.2d 793, 798 (10th Cir.1971) (same), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972). Nevertheless, because the issue of waiver is one of law, requires no further factual development, has been fully briefed by both parties, and can be resolved beyond any doubt, we will exercise our discretion to address the issue. See *Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *American Federation of Government Employees v. Carmen,* 669 F.2d 815, 820 n. 25 (D.C.Cir.1981); *Grace v. Burger,* 665 F.2d 1193, 1197 n. 9 (D.C.Cir. 1981), *aff'd in part and vacated in part on other grounds sub nom. United States v. Grace,* —— U.S. ——, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983).

■ The Government relies for its waiver argument primarily on *United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952). In *Tucker Truck Lines,* the appellee failed to raise before the Interstate Commerce Commission an objection to a hearing examiner's qualification under the Administrative Procedure Act, but later raised the objection in district court. The Supreme Court held

---

**15.** *Railroad Yardmasters v. Harris,* No. 82–2741, slip op. at 7 (D.D.C. Oct. 8, 1982), *reprinted in* J.A. 22. *Accord Air Line Pilots Ass'n, International v. Scheduled Skyways, Inc.,* 567 F.Supp. 171 (W.D.Ark.1983).

**16.** *Railroad Yardmasters v. Harris,* slip op. at 5–7, *reprinted in* J.A. 20–22.

**17.** *Id.* at 9, *reprinted in* J.A. 24.

**18.** *Id.* at 8, *reprinted in* J.A. 23.

that the district court should not have entertained the objection when first made at · that stage of the proceedings:

> [O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts.... Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.

334 U.S. at 37, 73 S.Ct. at 69. The Supreme Court limited its holding, however, by stating that "the defect in the examiner's appointment ... is not one which deprives the Commission of power or jurisdiction, so that even in the absence of timely objection its order should be set aside as a nullity." *Id.* at 38, 73 S.Ct. at 69; *see also Manual Enterprises v. Day,* 370 U.S. 478, 499 n. 5, 82 S.Ct. 1432, 1443 n. 5, 8 L.Ed.2d 639 (1962) (Brennan, J., concurring).[19] In *Tucker Truck Lines,* the appellee challenged only the examiner's, but not the Commission's, power to act. In the present case, in contrast, the appellee contends that the National Mediation Board had no power to act at all at a time when there were two vacancies on the Board. This challenge presents

a question of power or jurisdiction and is open to the appellee even if not initially asserted before the Board.[20]

 Furthermore, consideration of the policies served by the rule that issues not raised before the agency are waived indicates that we should not apply the rule in this case. *See McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969) (applicability of the doctrine of exhaustion of administrative remedies depends on whether application would further the purposes of the doctrine in the specific case); 4 K. Davis, Administrative Law Treatise § 26:7, at 444 (2d ed. 1983) (a court has discretion either to decide or not to decide an issue not raised before the agency, based on the circumstances and the requirements of justice). A principal policy rationale for the waiver rule is that judicial review might be hindered by the failure of the litigant to allow the agency to make a factual record, exercise its discretion, or apply its expertise. *See McKart,* 395 U.S. at 194, 89 S.Ct. at 1663. This rationale was found not to be pressing in *McKart, see id.* at 198–99, 89 S.Ct. at 1665; nor is it pressing in the present case. The substantive issue here, as in *McKart,* is solely one of statutory interpretation. Resolution of this issue does not require the development of a factual record, the application of agency expertise,[21] or the exercise of administra-

**19.** In *Manual Enterprises v. Day,* the Supreme Court set aside a ruling by the Judicial Officer of the Post Office barring a shipment of allegedly obscene magazines from the mail under 18 U.S.C. § 1461. In a concurring opinion joined by the Chief Justice and Justice Douglas, Justice Brennan argued that 18 U.S.C. § 1461 imposed criminal penalties on one who knowingly sends obscene matter through the mails, but did not grant the Post Office power to exclude such matter from the mails. Although the petitioner had not challenged the Post Office's power at the administrative level, Justice Brennan cited *Tucker Truck Lines* for the proposition that because that challenge presents a jurisdictional question it is open to the petitioners even if not initially asserted in the agency proceeding. 370 U.S. at 499 n. 5, 82 S.Ct. at 1443 n. 5. This court recently reiterated the rule that a reviewing court may consider a challenge to an agency's power or jurisdiction even if it was not raised before the agency.

*See Washington Ass'n for Television and Children v. FCC,* 712 F.2d 677, 682 & n. 8 (D.C.Cir. 1983).

**20.** Although it is not always obvious which questions are "jurisdictional" for purposes of avoiding waiver at the administrative level, *see Tucker Truck Lines,* 344 U.S. at 39, 73 S.Ct. at 70 (Frankfurter, J., dissenting); *Cotherman v. FTC,* 417 F.2d 587, 593–94 (5th Cir.1969), we believe that the challenge in this case to the authority of the National Mediation Board to take any action at all when only one member is in office clearly presents an issue of "power or jurisdiction."

**21.** The National Mediation Board has no general authority to promulgate constructions of the enabling provisions of the Railway Labor Act through adjudications or regulations. *See Detroit & Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 158–59, 90 S.Ct. 294, 303–04, 24 L.Ed.2d 325 (1969).

tive discretion. Thus, judicial review in the present case is not hindered by the failure of the appellee to raise its challenge before the Board. We therefore conclude that the District Court properly addressed the merits of RYA's complaint notwithstanding RYA's failure to raise its objection first before the Board.

### B. *Statutory Construction*

#### 1. *The "Delegation" Provision*

In considering the merits of RYA's complaint, we begin with the delegation provision, which provides in part that "[t]he Mediation Board is authorized by its order to assign, or refer, any portion of its work, business, or functions ... to an individual member of the Board ...." 45 U.S.C. § 154, Fourth (1976). The words of the statute, alone, lead us to the conclusion that

Congress did not intend to restrict the Board's authority to delegate. There is no language anywhere in the statute that actually imposes a limit on the Board's authority to delegate,[22] and the use of the adjective "any" to modify the word "portion" indicates that Congress intended to impose no limits at all.

The legislative history also gives some support to the foregoing literal interpretation of the statute. Congress in 1934 evidently used the Interstate Commerce Commission's delegation provision[23] as a model in drafting the statutory provision here in question. The language of the Board's delegation provision is thus similar to language in the ICC's delegation provision, and Congress alluded to the ICC's delegation provision in its explanation of the act estab-

**22.** If we were to hold that the use of the word "portion" somehow imposes limits on the Board's authority to delegate, we would be bereft of any standards for determining those limits.

**23.** Congress in 1933 added § 17(6) to the Interstate Commerce Act to authorize the Interstate Commerce Commission to delegate certain of its powers. Act of Feb. 28, 1933, ch. 136, 47 Stat. 1368. Section 17(6) provided that:

The commission is hereby authorized by its order to assign or refer any portion of its work, business, or functions arising under this or any other Act of Congress or referred to it by Congress, or either branch thereof, to an individual commissioner, or to a board composed of an employee or employees of the commission, to be designated by such order, for action thereon, and by its order at any time to amend, modify, supplement, or rescind any such assignment or reference: *Provided, however,* That this authority shall not extend to investigations instituted upon the commission's own motion nor, without the consent of the parties thereto, to contested proceedings involving the taking of testimony at public hearings. All such orders shall take effect forthwith and remain in effect until otherwise ordered by the commission. In case of the absence or inability for any other reason to act of any such individual commissioner or employee designated to serve upon any such board, the chairman of the commission may designate another commissioner or employee, as the case may be, to serve temporarily until the commission shall otherwise order. In conformity with and subject to the order or orders of the

commission in the premises, any such individual commissioner, or board acting by a majority thereof, shall have power and authority to hear and determine, order, certify, report, or otherwise act as to any of said work, business, or functions so assigned or referred to him or it for action by the commission and in respect thereof shall have all the jurisdiction and powers now or then conferred by law upon the commission and be subject to the same duties and obligations. Any order, decision, or report made or other action taken by any such individual commissioner or board in respect of any matters so assigned or referred shall have the same force and effect, and may be made, evidenced, and enforced in the same manner as if made or taken by the commission. Any party affected by any order, decision, or report of any such individual commissioner or board may file a petition for reconsideration or for rehearing by the commission or a division thereof and every such petition shall be passed upon by the commission or a division thereof. Any action by a division upon such a petition shall itself be subject to reconsideration by the commission, as provided in section 16a of this Act (U.S.C., title 49, sec. 16a), and in paragraph (4) of this section. The commission may, as provided in paragraph (1) of this section, make and amend rules for the conduct of proceedings before such individual commissioner or board and for the rehearing of such action before a division of the commission or the commission. The secretary and seal of the commission shall be the secretary and seal of such individual commissioner or board.
*Id.,* 47 Stat. at 1368–69.

lishing the Board.[24] However, the statute covering ICC delegations expressly provided that the authority to delegate did not extend to certain investigations and contested proceedings, and it also provided that affected parties had a right to petition for reconsideration or rehearing by the entire Commission.[25] These conditional terms make it plain that Congress knew how to restrict authority to delegate—and indeed had language to do so before it—when it drafted the Board's delegation provision. Yet Congress chose not to include *any* such restrictive language in the Board's delegation provision. Given these circumstances, it is surely reasonable to conclude that Congress did not intend to restrict the Board's authority to delegate. We therefore hold that a delegation by the Board of all of its functions to a single member, at least if it is for the purpose of preventing vacancies from disabling the Board, does not exceed the scope permitted by the delegation provision.[26]

**24.** The only statement in the legislative history of the act establishing the National Mediation Board that is relevant to the Board's authority to delegate provides that "[t]his new and smaller Board will have power to select and appoint employees to act as mediators under the instruction of the Board with the same freedom to delegate its work as the Interstate Commerce Commission now possesses." S.REP. No. 1065, 73d Cong., 2d Sess. 3 (1934).

**25.** *See* note 23, *supra.*

**26.** The District Court relied on *FTC v. Flotill Prods., Inc.,* 389 U.S. 179, 88 S.Ct. 401, 19 L.Ed.2d 398 (1967), to raise the objection that "[t]he delegation provision was not utilized by the Board to enable it to operate more efficiently but to enable it to stay in operation with only one Board member, in clear contravention of the quorum provision." *Railroad Yardmasters v. Harris,* No. 82–2741, slip op. at 9 (D.D.C. Oct. 8, 1982), *reprinted in* J.A. 24. In *Flotill Products,* the Supreme Court stated that the FTC's 1961 reorganization plan "and those like it were concerned with establishing the authority and procedure for *delegation* of functions so as to enable the respective agencies to operate more efficiently." 389 U.S. at 188, 88 S.Ct. at 406 (emphasis in original) (footnote omitted). In the next sentence, however, the Court noted that "the case before us is not one in which there was a delegation." *Id.* at 189, 88 S.Ct. at

## 2. *The "Vacancies" Provision*

Although the delegation provision authorizes the Board to delegate its powers to an individual member, the question remains whether vacancies on the Board affect the Board's powers or the ability of an individual member to exercise those powers pursuant to a delegation order. In particular, section 4, First of the Railway Labor Act provides that the Board is "to be composed of three members;" one might question whether the Board automatically ceases to exist or becomes incapacitated if the membership of the Board falls below three. The vacancies provision directly addresses this potential problem by providing that "[v]acancies in the Board shall not impair the powers nor affect the duties of the Board nor of the remaining members of the Board." 45 U.S.C. § 154, First (1976).

RYA urges that the word "vacancies" should be construed to mean "one vacancy." Under RYA's interpretation, two vacancies on the Board would impair the powers of the Board and of the remain-

407. The issue of the scope of FTC's authority to delegate was therefore not before the Court. In any case, it would seem that if the Board can use its authority to delegate in order to operate more efficiently, then *a fortiori* the Board can use its authority in order to continue to operate when it otherwise would be disabled. As we discuss below, such use of the authority to delegate is consistent with the overriding purpose of the Railway Labor Act. Finally, as we also discuss below, such use of the authority to delegate is not in contravention of the quorum provision nor of any other provision of the Act.

The District Court also argued that "[t]he NMB was without power on June 1, 1982 to delegate its authority with respect to the dispute between RYA and YSC because it was not yet before the Board. The YSC did not file an application with the Board until June 10, 1982, nine days after Chairman Brown's retirement." *Railroad Yardmasters v. Harris,* slip op. at 8, *reprinted in* J.A. 23. If the District Court is arguing that the Board can never delegate authority to act on matters that will arise in the future, we must flatly reject the argument. There is nothing in the language of the statute, its legislative history, or its purpose to suggest such an extreme limitation. If the District Court intended to suggest that the delegated authority did not survive Member Brown's resignation, we also reject that argument for reasons given below in Section C.

ing member, even if a valid delegation order had been issued. RYA's interpretation, however, ignores the plain meaning of the plural form, "vacancies." Although the word "vacancies" *includes* the singular, *see* 1 U.S.C. § 1 (1982), its ordinary meaning is certainly not *limited* to the singular. The words of a statute should be interpreted in their ordinary, everyday senses unless relevant internal evidence of the statute itself or the legislative purpose require otherwise. *See Malat v. Riddell,* 383 U.S. 569, 571–72, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966) (per curiam).

Furthermore, RYA's interpretation treats the words "vacancies" and "members" inconsistently: "vacancies" is interpreted to mean "one vacancy" while "members" is interpreted to mean "two members." We reject RYA's strained reading and hold that the words "vacancies" and "members" in the vacancies provision mean "one or two vacancies" and "one or two members." Thus, the vacancies provision is a succinct way of stating that one vacancy on the Board shall not impair the powers nor affect the duties of the Board nor of the two remaining members of the Board, and two vacancies on the Board shall not impair the powers nor affect the duties of the Board nor of the one remaining member of the Board.

### 3. The "Quorum" Provision

■ RYA argues that an interpretation of "vacancies" to include two vacancies makes the vacancies provision inconsistent with the quorum provision, which provides that "[t]wo of the members in office shall constitute a quorum for the transaction of the business of the Board." 45 U.S.C. § 154, First (1976). RYA's argument seems to be that the vacancies provision as we interpret it permits the Board to act with only one member in office, while the quorum provision prohibits the Board from acting with fewer than two members in office. This argument fails to distinguish between the different functions served by the two provisions.

The vacancies provision provides for the continued *existence* of power, while the quorum provision conditions the *exercise* of that power. A quorum is "[t]he minimum number of members who must be present at the meetings of a deliberative assembly for business to be legally transacted." H. ROBERT, ROBERT'S RULES OF ORDER 16 (rev. ed. 1981). In this case, then, the quorum provision provides that at least two members must be present at Board meetings for business to be transacted by the Board as a body at those meetings. Under the statute, however, the business of the Board need not be transacted solely in that fashion. Rather, the delegation provision provides that an individual member shall have power and authority to act as to any business that the Board has assigned or referred to him. 45 U.S.C. § 154, Fourth (1976). The business of the Board, therefore, may be transacted either by the Board as a body at a meeting attended by a quorum or by an individual member acting for the Board pursuant to a lawful delegation order.

Thus, when there are two vacancies, the Board and the remaining member continue to possess statutory powers; but, under the quorum provision, those powers no longer can be exercised by the Board as a body at Board meetings. The vacancies provision does not eliminate, reduce, or otherwise affect the quorum requirement: two members still are required for transaction of business at Board meetings.[27] If there has

---

**27.** RYA relies on *FTC v. Flotill Prods., Inc.,* 389 U.S. 179, 181 n. 3, 88 S.Ct. 401, 403 n. 3, 19 L.Ed.2d 398 (1967), for the proposition that a vacancies provision does not "regulat[e] the matter of a quorum." Our analysis is not inconsistent with that proposition. Our position is not that the vacancies provision regulates the quorum requirement, but that the quorum provision is inapplicable to the exercise of delegated powers. The Supreme Court in *Flotill* *Products* expressly noted that "the case before us is not one in which there was a delegation." 389 U.S. at 189, 88 S.Ct. at 407.

RYA also relies on *Braniff Airways v. CAB,* 379 F.2d 453, 460 (D.C.Cir.1967), *WIBC v. FCC,* 259 F.2d 941, 943 (D.C.Cir.), *cert. denied,* 358 U.S. 920, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958), and *David B. Lilly Co. v. United States,* 571 F.2d 546, 549, 215 Ct.Cl. 572 (1978), for the proposition that when a statute specifies a nu-

been a delegation of the Board's powers, however, then under the vacancies provision the Board and the remaining member retain their statutory powers, and under the delegation provision the remaining member is authorized to exercise those powers as an individual member. This result does not contradict the quorum provision: the quorum provision is simply inapplicable to the exercise of delegated powers, regardless of the number of vacancies on the Board. Nor does this result in any way nullify the quorum provision. Indeed, the quorum provision had to have been satisfied when the delegation was made in order for the delegation to be valid.

### 4. The Purpose of the Statute

As may be seen from the foregoing analysis, under our construction of the statute, the delegation, vacancies, and quorum provisions mesh together to form a coherent framework for the exercise of Board powers and the execution of Board duties. We have given every word its ordinary meaning and every provision full effect. Furthermore, we believe that this interpretation is consistent with the legislative purpose underlying the applicable statutory provisions.

The objective of the Railway Labor Act is "to insure to the public continuity and efficiency of interstate transportation service, and to protect the public from the injuries and losses consequent upon any impairment or interruption of interstate commerce

through failures of managers and employees to settle peaceably their controversies." H.R.REP. NO. 328, 69th Cong., 1st Sess. 1 (1926). The National Mediation Board, which administers the provisions of the Railway Labor Act, plays a central role in accomplishing this objective. Congress' concern that vacancies on the Board not interfere with the Board's ability to take prompt action to avert labor strife that could cripple the nation's transportation system is evinced by the vacancies provision itself. The existence of two vacancies on the Board is not beyond contemplation and the consequences could be catastrophic if such vacancies were completely to disable the Board for any period of time. Congress provided a statutory mechanism that permits the Board to continue to function during such an exigency. The use of that mechanism, at least if limited to the exigency that necessitates it, is in accord with the purposes of the Act.[28]

### C. Application to the Present Case

It remains to apply the statutory provisions to the present case to determine the validity of the two disputed orders that were issued by the Board on September 7 and 14, 1982. We begin by noting that the delegation order of June 1, 1982, was properly issued. That order was executed by the Board acting through a quorum consisting of Members Harris and Brown. The

---

merical quorum requirement, that number of members must participate in the decisional process for deliberative agency action to be valid. Like *Flotill Products,* however, neither *Braniff Airways, WIBC,* nor *David B. Lilly Co.* involved a delegation of decision-making authority. Those cases are therefore inapposite to the present case.

**28.** We note the Government's additional argument that congressional inaction following the exercise in 1947 of the Board's powers by a single remaining member acting pursuant to a validly issued delegation order, *see* note 10, *supra,* amounts to congressional ratification of the Board's construction of its governing statute. *Cf. FTC v. Flotill Prods., Inc.,* 389 U.S. 179, 189–90 & n. 13, 88 S.Ct. 401, 407 & n. 13, 19 L.Ed.2d 398 (1967) ("[F]rom the beginning the Commission has periodically had unfilled vacancies for significant lengths of time, vacan-

cies which Congress of course had to know about.... If, as respondent suggests, the prospect of the Commission acting through the split decision of three Commissioners should be so inconsistent with the nature of the Commission, it is indeed strange that Congressmen ... should not in all these years have taken steps to prevent a Commission—reduced to three by a double vacancy or by a single vacancy plus an abstention—from rendering such a decision."). Although this argument supports our conclusions, we decline to attach any weight to congressional inaction in the face of informal agency action of brief duration and effect that was never challenged by any party and that was never, as far as the record shows, "fully brought to the attention of the public and the Congress," *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 535, 102 S.Ct. 1912, 1925, 72 L.Ed.2d 299 (1982).

delegation order was authorized by and was within the scope of the delegation provision. The delegation order was narrowly tailored to the exigency that necessitated it. RYA has not alleged that the order was issued for any purpose other than to enable the Board to continue to function until a second member took office. By its terms the order expired when that event occurred and a quorum was restored.

Next, we note that Member Brown's resignation did not terminate the delegation of authority. This result follows directly from the statute itself, which provides that "[a]ll such [delegation] orders shall take effect forthwith and remain in effect until otherwise ordered by the Board." 45 U.S.C. § 154, Fourth (1976). Even without this statutory provision, however, the delegation of authority would not have terminated upon Member Brown's resignation. The delegation in this case was institutional rather than personal. Member Brown did not delegate his personal authority to Member Harris. Rather, the Board as a body, acting through a quorum consisting of Members Brown and Harris, delegated institutional powers to Member Harris. Institutional delegations of power are not affected by changes in personnel, but rather continue in effect as long as the institution remains in existence and the delegation is not revoked or altered. *See Donovan v. National Bank of Alaska,* 696 F.2d 678, 682 (9th Cir.1983); *United States v. Messersmith,* 692 F.2d 1315, 1317 (11th Cir.1982); *United States v. Wyder,* 674 F.2d 224, 227 (4th Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982); *David B. Lilly Co. v. United States,* 571 F.2d 546, 550, 215 Ct.Cl. 572 (1978).[29] Any other general rule would impose an undue burden on the administrative process. *See Donovan,* 696 F.2d at 682; *Wyder,* 674 F.2d at 227. In the present case, under the vacancies provision the Board continued in existence after Member Brown resigned, and therefore the delegation of authority to Member Harris would have continued in effect even if the statute had not expressly so provided.[30]

---

**29.** *Donovan v. National Bank of Alaska, United States v. Wyder* and *United States v. Messersmith* involved delegations of authority by administrative officials rather than by administrative bodies. Such delegations are still institutional, however, and, as the Fourth, Ninth and Eleventh Circuits held, continue in effect after the end of the officials' tenures until revoked or altered by their successors in office. In *Donovan v. National Bank of Alaska,* Secretary Marshall had delegated to officers of the Department of Labor authority to conduct investigations of banks. The Ninth Circuit held that the delegations remained in effect after Secretary Marshall left office and was succeeded by Secretary Donovan. In *United States v. Wyder,* Attorney General Griffin Bell had delegated to the Assistant Attorney General in charge of the Criminal Division authority to authorize applications for wiretaps. The Fourth Circuit held that the delegation remained in effect after Attorney General Bell left office and was succeeded by Attorney General Benjamin Civiletti. *Accord United States v. Messersmith,* 692 F.2d 1315, 1317 (11th Cir.1982).

*David B. Lilly Co. v. United States* involved a delegation by a quorum of the Renegotiation Board to the Chairman of power to issue orders in a case. Before the Chairman issued the orders, three of the five Board Members resigned, leaving less than a quorum of three in office. The Court of Claims held that the delegation was not defeated by the resignation of the Board Members who had made the delegation or by the lack of a quorum in office when the Chairman exercised the delegated power. The Court of Claims reasoned that "[t]he Board is a continuing body and remained so throughout the period. In light of this circumstance, the assertion that the delegation was extinguished before implemented is simply untenable." 571 F.2d at 550.

**30.** RYA cites *A.B. Phillips v. Fidalgo Island Packing Co.,* 238 F.2d 234, 235 (9th Cir.) (per curiam), *cert. denied,* 352 U.S. 944, 77 S.Ct. 262, 1 L.Ed.2d 237 (1956), for the proposition that a delegation of authority by a public officer terminates when the officer departs from office. RYA mischaracterizes *A.B. Phillips.* In that case, a commission that had delegated power to its Executive Director was abolished. The Ninth Circuit held that the delegated power expired when the commission went out of existence. That result is completely consistent with our analysis above.

The dissenting opinion argues that when a quorum of the Board by order makes a delegation, that delegation ceases to exist when the quorum no longer exists. The only support cited for this proposition is 2 W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 421 (rev. perm. ed. 1982). Fletcher states only that "[t]he general rule is well settled that the power of a board of directors is not suspended by vacancies on the board unless the

■ Finally, we note that Member Harris had power to act for the Board pursuant to the delegation order: the delegation provision provides that an individual member of the Board shall have power and authority to act as to any of the work, business, or functions assigned to him by the Board. *See* 45 U.S.C. § 154, Fourth (1976). Furthermore, under the vacancies provision, neither the Board's powers that were delegated nor Member Harris' powers to act pursuant to the delegation order were impaired by the vacancies on the Board.[31]

We therefore hold that the orders of September 7 and 14, 1982, were validly issued for the Board by Member Harris pursuant to the delegation order of June 1, 1982.[32]

### III. LIMITS OF THIS OPINION

■ We have concluded that a single member of the National Mediation Board may act for the Board pursuant to a validly issued delegation order that is narrowly tai-lored to prevent the temporary occurrence of two vacancies from completely disabling the Board. We believe that our conclusion is compelled by a close reading of the plain words of the statute and is fully consistent with the legislative history and the purposes of the Act. The dissenting opinion appears to reach a contrary conclusion not so much because it interprets the words of the statute differently but, rather, because it perceives that the majority opinion somehow opens the door to potential abuses of power. We believe that the concerns expressed in the dissenting opinion are greatly overstated, primarily because the dissent seriously misconstrues the limits of this decision.

First, we wish to emphasize the narrowness of our holding in this case. We have authorized delegation of Board powers to a single member *only* when required to prevent temporary vacancies from disabling

---

number be reduced below a quorum." *Id.* at 270 (footnote omitted). No mention is made of delegations. Furthermore, the applicable rule in the present case is provided not by the common law of corporations but by the vacancies provision of the statute itself, which clearly and expressly provides that vacan*cies* in the Board shall not impair the powers of the Board. The dissent avoids a direct confrontation with the problem of construing the vacancies provision. But the position adopted by the dissent only can be reconciled with the vacancies provision by interpreting the word "vacancies" to mean "one vacancy." For the reasons discussed above, we find that interpretation impermissible.

31. This case does not raise, and we need not decide, the issue whether an employee of the Board could act for the Board pursuant to a delegation order if all three Board members resigned. We note, however, that this result by no means follows from our construction of section 4 of the Act. We have interpreted the word "vacancies" in the vacancies provision to mean "one or two vacancies" and the words "remaining members" to mean "one or two remaining members." Thus, if all three members resigned, the vacancies provision would not apply to preserve the powers of the Board. Indeed, the Board would cease to exist. Accordingly, the powers of the Board that were delegated also would cease to exist, and the remaining employee would have no powers to exercise. Furthermore, we note that the vacancies provision provides only that "[v]acan-cies in the Board shall not impair the powers nor affect the duties of the Board nor of the remaining *members* of the Board." 45 U.S.C. § 154, First (1976) (emphasis added). The vacancies provision does not apply to the preservation of the powers and duties of *employees* of the Board.

32. Even under the District Court's view that the orders were not validly issued, which we reject, the judgment of the District Court should have been given prospective-only application. We base this conclusion upon consideration of three factors identified by the Supreme Court as being relevant. *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982); *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971). First, the District Court's decision established a new principle of law by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, the purpose of the decision, which was to effectuate the intent of Congress in establishing the National Mediation Board, would be retarded by retrospective operation, because Congress' overriding intent was to avoid labor strife in the railroad and airline industries. Overturning the orders that the Board issued from June 1 to October 12, 1982, would thwart that intent. Third, retrospective application could produce substantial inequitable results to persons who reasonably relied on the actions taken by the Board during that period.

the Board and, thus, necessary to effectuate Congress' overriding purpose of maintaining labor peace in the critical railroad and airline industries. Furthermore, we emphatically have *not* authorized any unaccountable exercise of Board powers by agency employees. *See* note 31, *supra*.

Second, we believe that the dissent misperceives "the nature of the animal" that Congress created. Unlike the National Labor Relations Board, the National Mediation Board is not principally engaged in substantive adjudications; in particular, the Board does not adjudicate unfair labor practices or seek to enforce individual rights under the Act. Rather, the Board's main functions involve invocations of *procedures* of the Railway Labor Act. Thus, as noted at the beginning of this opinion, the Board's primary responsibilities are to mediate contract disputes, investigate representation disputes and conduct representation elections, and administer arrangements for the arbitration of disputes under collective bargaining agreements. The nature of the Board's role is perhaps best illustrated by its critical duty—which it discharged several times in the present case during the period when only one member was in office—of notifying the President that a labor dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service," 45 U.S.C. § 160 (1976). Upon such notification the Board's role ceases: the President, however, may create an emergency board to investigate the dispute, during which time neither party may resort to self-help including strikes or lockouts. We simply fail to see how the Board's powers to invoke such statutory procedures are susceptible to the kinds of abuse by a single member that the dissent apparently fears. What we do see is the havoc that could be wreaked upon the nation's economy—the very havoc that Congress enacted the Railway Labor Act to prevent—if such powers were suspended for any amount of time by the temporary occurrence of two vacancies on the Board.

CONCLUSION

For the foregoing reasons, the judgment of the District Court is

*Reversed.*

WALD, Circuit Judge, dissenting:

Recognizing that the panel arrives at an *efficient* result in approving the 10:00 a.m. delegation by two members of complete Board authority to one member for an indefinite period in anticipation of the 10:15 a.m. resignation of the only other member, I nonetheless conclude that what occurred in this case simply does not comport with what the statute says, and that the breadth of its sanctioning by the panel establishes a dangerous precedent.

There is no dispute that section 4 of the Railway Labor Act provides for the following in the first paragraph: a three-person National Mediation Board (not a single administrator); that vacancies shall not impair the powers nor affect the duties of the *Board* nor of the remaining members; and, immediately following the "vacancies" provision, that *two* members in office shall constitute a quorum for the transaction of the business of the Board. 45 U.S.C. § 154, First (1976).

So far, so good. It seems clear enough, and I believe the majority agrees, that two members must be present to transact the business of the three-person Board. Vacancies will not impair the Board's functions so long as there are two members to transact business. The section additionally provides that in the event a member's term runs out before a successor is qualified, he or she shall continue in office until a successor takes over. 45 U.S.C. § 154, First (1976). By this latter provision, Congress meant to ensure that the balanced structure of the Board could be maintained even if there were delays in the President's appointment and the Senate's approval of a new Board member.

Several paragraphs later, the section provides for the delegation by Board order of "any portion" (not the whole) of Board business to a single member "or to an em-

ployee or employees" of the Board.[1] The Board "by its order" can "amend, modify, supplement, or rescind any such assignment or reference." All such delegation orders remain in effect until otherwise ordered by the *Board.* 45 U.S.C. § 154, Fourth (1976).

My colleagues read this delegation power to permit the conferring upon one member of *all* the Board's authority for an indefinite period until such time as a second member shall take office. They feel that this delegation power overrides the quorum provision, which they say is confined only to Board business transacted at Board meetings, not to Board business transacted by a member pursuant to a Board delegation.[2] I, on the other hand, find the results of such an interpretation to be convoluted, potentially dangerous in terms of accountability, and contrary to the nature of the animal that Congress thought it was creating.[3] Cognizant of the limbo into which Board business has been thrown—twice in its history—when a majority of its three members resigned or left office before their successors were qualified, I nevertheless believe we are standing the statutory scheme on its head by sanctioning such an open-ended delegation procedure. I believe that Congress, recognizing the recurrent nature of the problem and the inadequacy of its past efforts to deal with it, should now make specific provision for the circumstance where two out of three members resign

from the Board before their successors are qualified.

These are my reasons: I will not belabor them with extensive citations because the propositions seem self-evident. When a quorum of the Board by order makes a delegation, that delegation ceases to exist when the quorum no longer exists. This is well-established in corporation law, *see* 2 *Fletcher Cyclopedia Corporations* § 421, at 2709–71 (perm. ed. 1982), and there is no indication that such a fundamental agency principle was meant to be abrogated by Congress in this statute. Section 4 itself specifically says that the Board (*i.e.,* a quorum) at any time can amend or rescind any such assignment and can rescind any order issued by its delegate. But, in my colleagues' view of the statute, those powers to rescind either the delegation or the delegate's order are wiped out. For after the second member leaves office, the Board has no ability to rescind or amend the reference, no matter how the single member performs or does not perform his duties. Nor can it modify or revoke any order, no matter how unwise that order might be. There is no self-correction mechanism at all under their scheme, for no matter what the single member does, at least until a new member takes office, his delegation continues. It is an understatement to say this does not comport with any rules by which

---

1. In usual parlance, portion means "a: a part of a whole ... b: a limited amount or quantity." Webster's Third New Int'l Dictionary 1768 (1976).

2. *I note that only by a strained interpretation and indeed insertion of "missing" words can the majority comfortably circumscribe the authority of the Board to delegate.* "Vacancies" must mean "one or two [but not three] vacancies"—although the Board as an institution exists even if it cannot act for lack of a quorum if *two members resign, it ceases to exist as an institution if three members resign; if delegation is to a Board member, the vacancy clause gives effect to the delegation, while if the delegation is to an employee, it is invalid, despite the words of the delegation clause which treat Board members and employees identically. See* Maj.Op., text at n. 31.

3. The majority notes that the delegation provision was modelled after that used in a 1933

amendment to the Interstate Commerce Act, Act of Feb. 28, 1933, ch. 136, 47 Stat. 1368. *See* Maj.Op., text at nn. 23 & 24. The history of that amendment unambiguously indicates that Congress never intended, and in fact feared, removing delegated functions from Commission accountability. *See* 76 Cong.Rec. 4540–41 (1933) (remarks of Reps. Stafford and Rayburn) (discretion of employee delegate limited by Commission review). The purpose of the delegation provision in that amendment was merely to relieve the Commission from "pass[ing] personally upon a multitude of matters which are of comparatively little importance, but yet cannot be disposed of as a matter of routine." H.R.Rep. No. 1900, 72d Cong., 2d Sess. 1 (1933); S.Rep. No. 1291, 72d Cong., 2d Sess. 1–2 (1933). Clearly, the majority's reading of the delegation provision falls well outside this limited efficiency-minded purpose.

corporations or agencies normally operate. *Cf.* Restatement (Second) of Agency §§ 120, 122 (1957) ("[t]he death of the principal or loss of its capacity to act terminates the authority of the agent without notice to him"); 2 Fletcher, *supra,* § 504, at 514 ("[d]elegated authority ceases upon the resignation of the officer who delegated such authority").

Perhaps, under the majority's expansive reading of the delegation powers, a single member entrusted with the entire powers of the Board, including the power to delegate or amend the delegation, can amend or rescind his own delegation. While this is no help should he misbehave, it does raise an interesting question about any future delegations *he* might make. The delegation provision specifically allows for delegation to Board employees. Under my colleagues' interpretation of vacancies and open-ended delegations, I see no impediment to the single member delegating all or some of the Board business to an employee, and himself retiring, leaving a headless ship altogether. I do not suggest this is likely, but the mere possibility illustrates that Congress surely did not mean to let one member by delegation function as the Board indefinitely.

The reality is there is *no Board* once two members resign. There is *no quorum, no power to delegate* or *keep a delegation in*

*effect, amend or rescind it.*[4] It is inconvenient and unfortunate that this is so, and provision should be made in the statute for interim appointments or the like. But we should not attempt to convolute the statutory scheme to assure that the show goes on. By so doing, we invite potential abuses both in delayed appointments, and in unaccountable concentrations of authority in the future. More importantly, we do not follow Congress' intent as to the process that supplicants to the Board are due.

As for any problems caused by the possible invalidity of actions taken by member Harris during the ten months that he was the sole member of the Board, I agree with the majority that we can bar attacks on such actions by applying our holding prospectively.[5] *See* Maj.Op. at n. 32 and cases cited therein; *see also Buckley v. Valeo,* 424 U.S. 1, 142, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976) (per curiam) ("[Federal Election] Commission's inability to exercise certain powers because of the method by which its members have been selected should not affect the validity of the Commission's administrative actions and determinations to date"). In this case, the overriding public interest in assuring certainty of Board decisions and in protecting third parties' reliance on them, justifies such a prospective application. The practicalities of the immediate situation thus do not preclude a hold-

---

**4.** *David B. Lilly Co. v. United States,* 571 F.2d 546, 215 Ct.Cl. 572 (1978), is the only faintly analogous precedent, and I read that case as supportive of this proposition. The plaintiff in *Lilly* attacked the validity of Renegotiation Board orders because they were *issued* after three Board members' resignations left the Board with an insufficient number of members to constitute a quorum. The Court of Claims, in a 3 to 2 decision, held the order valid because *the deliberative process* was complete before the Board members resigned, and "the overall preparation of the [order] form is standard and ministerial, hence capable of delegation." *Id.* 571 F.2d at 549–50. Implicit in this holding is that nonministerial decision making functions as fundamental as issuing orders are not delegable to less than a quorum of the whole Board.

**5.** Even when a court applies a new rule of law prospectively only, it generally applies the rule to the case before it. *See, e.g., Northern Pipe-*

*line Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982); *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) (refusing to apply retroactively an interpretation of Outer Continental Shelf Lands Act announced *and applied* in *Rodriguez v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969)); *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) (refusing to apply retroactively constitutional interpretations regarding confessions announced *and applied* in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); *but cf. Buckley v. Valeo,* 424 U.S. at 142, 96 S.Ct. at 693 (validating *rules* promulgated by improperly constituted commission and holding that they apply to parties in suit). Thus, although I agree with the majority that my view of the merits should apply prospectively only, it would still affect the outcome in this case.

ing by this court that indefinite delegations of all the Board's powers to a single member are not authorized by the present statute.