# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 5, 2012   Decided January 25, 2013

No. 12-1115

NOEL CANNING, A DIVISION OF THE NOEL CORPORATION,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 760,
INTERVENOR

———

Consolidated with 12-1153

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

 *Noel J. Francisco* argued the cause for petitioner. With him on the briefs were *G. Roger King*, *James M. Burnham*, and *Gary E. Lofland*.

 *Miguel A. Estrada* argued the cause for *amici curiae* Senate Republican Leader Mitch McConnell and 41 other members of the United States Senate in support of petitioner/cross-respondent Noel Canning.

*Jay Alan Sekulow* was on the brief for *amicus curiae* The Speaker of the United States House of Representatives, John Boehner, in support of petitioner. *John N. Raudabaugh* entered an appearance.

*Glenn M. Taubman*, *William L. Messenger*, *Richard P. Hutchison*, and *Mark R. Levin* were on the brief for *amici curiae* Landmark Legal Foundation, et al. in support of petitioner.

*Beth S. Brinkmann*, Deputy Assistant Attorney General, U.S. Department of Justice, and *Elizabeth A. Heaney*, Attorney, National Labor Relations Board, argued the causes for respondent. With them on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Scott R. McIntosh*, *Sarang V. Damle*, *Melissa N. Patterson*, and *Benjamin M. Shultz*, Attorneys, *John H. Ferguson*, Associate General Counsel, National Labor Relations Board, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Attorney.

*James B. Coppess* argued the cause for intervenor. With him on the brief were *Bradley T. Raymond* and *Laurence Gold*.

*Victor Williams*, *pro se*, filed the brief for *amicus curiae* Professor Victor Williams.

Before: SENTELLE, *Chief Judge*, HENDERSON and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* GRIFFITH.

SENTELLE, *Chief Judge*: Noel Canning petitions for review of a National Labor Relations Board ("NLRB" or "the Board") decision finding that Noel Canning violated section 8(a)(1) and

(5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (5), by refusing to reduce to writing and execute a collective bargaining agreement reached with Teamsters Local 760 ("the Union"). *See Noel Canning, A Division of the Noel Corp.*, 358 N.L.R.B. No. 4, 2012 WL 402322 (Feb. 8, 2012) ("Board Decision"). NLRB cross-petitions for enforcement of its order. On the merits of the NLRB decision, petitioner argues that the Board did not properly follow applicable contract law in determining that an agreement had been reached and that therefore, the finding of unfair labor practice is erroneous. We determine that the Board issuing the findings and order could not lawfully act, as it did not have a quorum, for reasons set forth more fully below.

## I. INTRODUCTION

At its inception, this appears to be a routine review of a decision of the National Labor Relations Board over which we have jurisdiction under 29 U.S.C. § 160(e) and (f), providing that petitions for review of Board orders may be filed in this court. The Board issued its order on February 8, 2012. On February 24, 2012, the company filed a petition for review in this court, and the Board filed its cross-application for enforcement on March 20, 2012. While the posture of the petition is routine, as it developed, our review is not. In its brief before us, Noel Canning (along with a movant for status as intervenor whose motion we will dismiss for reasons set forth hereinafter) questions the authority of the Board to issue the order on two constitutional grounds. First, petitioner asserts that the Board lacked authority to act for want of a quorum, as three members of the five-member Board were never validly appointed because they took office under putative recess appointments which were made when the Senate was not in recess. Second, it asserts that the vacancies these three members purportedly filled did not "happen during the Recess of the

Senate," as required for recess appointments by the Constitution. U.S. Const. art. II, § 2, cl. 3. Because the Board must have a quorum in order to lawfully take action, if petitioner is correct in either of these assertions, then the order under review is void *ab initio*. *See New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010).

Before we can even consider the constitutional issues, however, we must first rule on statutory objections to the Board's order raised by Noel Canning. It is a well-settled principle of constitutional adjudication that courts "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *see also Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944); *United States v. Waksberg*, 112 F.3d 1225, 1227 (D.C. Cir. 1997). We must therefore decide whether Noel Canning is entitled to relief on the basis of its nonconstitutional arguments before addressing the constitutional question. Noel Canning raises two statutory arguments. First, it contends that the ALJ's conclusion that the parties in fact reached an agreement at their final negotiation session is not supported by substantial evidence. Second, it argues that even if such an agreement were reached, it is unenforceable under Washington law. We address each argument in turn.

## A. The Sufficiency of the Evidence

Refusal to execute a written collective bargaining agreement incorporating terms agreed upon during negotiations is an unfair labor practice under section 8(a)(1) and (5) of the NLRA. *H. J. Heinz Co. v. NLRB*, 311 U.S. 514, 525–26 (1941). Whether the parties reached an agreement during negotiations is a question of fact. *See NLRB v. Int'l Bhd. of Elec. Workers*,

748 F.2d 348, 350 (8th Cir. 1984); *NLRB v. Roll & Hold Div. Area Transp. Co.*, 957 F.2d 328, 331 (7th Cir. 1992). We therefore must affirm the Board's conclusion that an agreement was in fact reached if that conclusion is supported by substantial evidence. 29 U.S.C. § 160(e).

Noel Canning and the Union had in the past enjoyed a long collective bargaining relationship, but the parties were unable to reach a new agreement before their most recent one expired in April 2010. Negotiations began in June 2010. By the time the parties met for their final negotiation session in December 2010, all issues save wages and pensions had been resolved. According to notes taken by Union negotiators at the parties' final negotiating session, the parties agreed to present two alternative contract proposals to the Union membership: one preferred by Noel Canning management and the other by the Union. Each proposal included wage and pension increases but allocated the increases differently. The notes reveal that the Union proposal put no limit on the membership's right to decide how much of the $0.40 per hour pay increase to allocate to its pension fund. According to the notes and Union witnesses, the parties agreed that both proposals would be submitted to the Union membership for a ratification vote and that the parties would be bound by the outcome of that vote. Union negotiators testified that after the parties read aloud the terms of the two proposals, Noel Canning's president stood and said "let's do it." Deferred Appendix 78. A Noel Canning officer agreed to email the terms to the Union the next day. After the company agreed to allow the Union to use a company conference room to hold the vote, the negotiators shook hands and departed.

The next day, Noel Canning management emailed the Union the wage and pension terms of the two proposals. According to the email, however, the Union proposal capped at $0.10 the amount of the $0.40 pay increase that the membership

could devote to its pension fund. The email thus conflicted with the Union negotiators' notes, which left the allocation question entirely to the membership. When the chief Union negotiator, Bob Koerner, called Noel Canning's president to discuss the discrepancy, the president responded that since the agreement was not in writing, it was not binding. The vote took place anyway, and the membership ratified the Union's preferred proposal, which allocated the entire pay increase to the pension fund. Noel Canning posted a letter informing the Union that the company considered the ratification vote to be a counteroffer, which the company rejected, and declared the parties to be at an impasse. Noel Canning subsequently refused to execute a written agreement embodying the terms ratified by the Union.

The Union filed an unfair labor practice charge premised on Noel Canning's refusal to execute the written agreement. After a two-day hearing, the ALJ determined that the parties had in fact achieved *consensus ad idem* as to the terms of the Union's preferred proposal and that Noel Canning's refusal to execute the written agreement constituted an unfair labor practice under section 8(a)(1) and (5) of the NLRA. The ALJ ordered Noel Canning to sign the collective bargaining agreement. Noel Canning timely filed exceptions to the ALJ's decision, and the Board affirmed.

Unsurprisingly, the parties' testimony at the ALJ hearing conflicted over whether the parties in fact agreed to the terms of the Union proposal. The ALJ's decision thus rested almost entirely on his determination of the witnesses' credibility. Assessing the conflicting testimony, the ALJ determined that because the Union witnesses' testimony was corroborated by contemporaneous notes taken during the December 2010 negotiation session, the Union's witnesses were credible. In contrast, he determined that Noel Canning's witnesses were not credible because they neither "produced notes of the meeting

[n]or explained why no notes were available" and because their testimony was "abbreviated, conclusionary, nonspecific, and unconvincing." Board Decision at 7 (ALJ Op.).

We are loathe to overturn the credibility determinations of an ALJ unless they are "hopelessly incredible, self-contradictory, or patently insupportable." *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1250 (D.C. Cir. 2012) (internal quotation marks omitted). Here, the ALJ chose the corroborated testimony of Union negotiators over the unsupported testimony of Noel Canning employees. And given undisputed testimony that at least one Noel Canning representative took notes of the meeting, the ALJ weighed Noel Canning's failure to corroborate its testimony against it. As we noted, the ALJ also found Noel Canning's witnesses' testimony to be unspecific and abbreviated. In *Monmouth Care Center v. NLRB*, we found no reason to set aside a credibility determination where "the ALJ credited the testimony of the union's negotiator over that of the petitioners' representatives . . . based on a combination of testimonial demeanor and a lack of specificity and internal corroboration for the petitioners' claims." 672 F.3d 1085, 1091 (D.C. Cir. 2012). The ALJ made a nearly identical determination here, and we discern no reason to disturb it.

Noel Canning nevertheless claims that Koerner's testimony is plagued by inconsistencies. But the inconsistencies and contradictions it identifies are either irrelevant or merely the result of the competing testimony of the two parties' witnesses. There is nothing in the Union testimony — corroborated by contemporaneous notes — that hints at hopeless incredibility or self-contradiction.

Noel Canning thus relies on what it alleges to be an inconsistency between Koerner's testimony and his affidavit. The affidavit, which is not in the record, apparently contained

the following sentence, referring to the parties' tentative agreement as "TA": "I was voting the contract on Wednesday and that I would vote what we TA'd during the December 8th meeting — noting different than TA'd." Deferred Appendix 74. When asked at the ALJ hearing if he saw any errors in his affidavit, Koerner claimed he saw none but struggled to explain what the language meant. Noel Canning contends that the affidavit is an explicit admission that Koerner presented an offer to the Union that was materially different from the one agreed upon by the parties and therefore contradicts his testimony. The ALJ rejected Noel Canning's interpretation, concluding that the sentence suffered from a typographical error — "noting" should have been "nothing" — and that the error accounted for the witness's inability to explain the affidavit's meaning. Board Decision at 5 n.8 (ALJ Op.).

We conceive of no reason to disagree. As written, the language of the affidavit is confusing and becomes intelligible only if the typographical error pointed out by the ALJ is corrected. Moreover, the ALJ specifically determined that the witness was confused by the affidavit, not that he was trying to conceal deception, as Noel Canning contends. We are "ill-positioned to second-guess" that determination. *W.C. McQuaide, Inc. v. NLRB*, 133 F.3d 47, 53 (D.C. Cir. 1998). And even assuming that Noel Canning's reading is correct, it does not support the company's chief argument before the Board — that the parties failed to reach *any* agreement at the December 2010 negotiation session — because even the affidavit evinces that the parties reached some sort of agreement. Given the deference we owe to the ALJ's credibility determinations, the consistency between the negotiators' notes and the deal the membership approved, and the lack of any evidence otherwise suggesting that Koerner was an incredible witness, this case is not the rare one in which we will overturn an ALJ's credibility

determination. The Board's decision was therefore supported by substantial evidence.

## B. The Enforceability of the Contract

We also agree with the Board that we lack jurisdiction to consider Noel Canning's choice of law argument. Section 10(e) of the NLRA forbids us from exercising jurisdiction to hear any "objection that has not been urged before the Board." 29 U.S.C. § 160(e); *see also Chevron Mining, Inc. v. NLRB*, 684 F.3d 1318, 1329–30 (D.C. Cir. 2012). The ALJ specifically rejected Noel Canning's argument that he should apply Washington state law to decide whether the contract could be enforced. In its exceptions to the Board, however, Noel Canning did not mention Washington law. Although Noel Canning contended that the ALJ incorrectly determined that the parties had in fact reached *consensus ad idem* during negotiations, it nowhere argued that the ALJ made an incorrect choice of law to govern the contracts issue.

"While we have not required that the ground for the exception be stated explicitly in the written exceptions filed with the Board, we have required, at a minimum, that the ground for the exception be evident by the context in which the exception is raised." *Trump Plaza Assocs. v. NLRB*, 679 F.3d 822, 829 (D.C. Cir. 2012) (internal quotation marks omitted). Nothing in Noel Canning's exceptions even hints that it objected to the application of federal law. On the contrary, it conceded to the Board that "[i]t is not in dispute that an employer violates [the NLRA] by refusing to execute a Collective Bargaining Agreement incorporating all of the terms agreed upon by the parties during negotiations." Deferred Appendix 100. We therefore lack jurisdiction to consider Noel Canning's state-law argument because its objections were not "adequate to put the Board on notice that the issue might be pursued on appeal."

*Consol. Freightways v. NLRB*, 669 F.2d 790, 794 (D.C. Cir. 1981). Having determined that Noel Canning does not prevail on its statutory challenges, consideration of the constitutional question is unavoidable, and we proceed to its resolution.

Because we agree that petitioner is correct in both of its constitutional arguments, we grant the petition of Noel Canning for review and deny the Board's petition for enforcement.

## II. JURISDICTION

Although no party has questioned our jurisdiction to decide the constitutional issues raised in this petition, federal courts, being courts of limited jurisdiction, must assure themselves of jurisdiction over any controversy they hear, regardless of the parties' failure to assert any jurisdictional question. *See Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984). We note at the outset that there is a serious argument to be made against our having jurisdiction over the constitutional issues. Section 10(e) of the NLRA, governing judicial review of the Board's judgments and petitions for enforcement, provides: "No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). The record reflects no attempt by petitioner to raise the threshold issues related to the recess appointments before the Board. Our first question, then, is whether this failure to urge the objection before the Board comes within the exception for "extraordinary circumstances." We hold that it does.

We acknowledge that no governing precedent directly addresses this question. Nonetheless, there is instructive precedent from other circumstances and other similar administrative proceedings under other statutes. First, we note

that in another administrative agency review, *Railroad Yardmasters of America v. Harris*, we held that a challenge to the authority of the National Mediation Board on the basis that it had no quorum "present[ed] a question of power or jurisdiction and is open to the appellee even if not initially asserted before the Board." 721 F.2d 1332, 1338 (D.C. Cir. 1983). In *Railroad Yardmasters*, we relied on the Supreme Court's decision in *United States v. L. A. Tucker Truck Lines, Inc. Id.* at 1337–38 (discussing *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952)). In *L. A. Tucker Truck Lines*, the Court considered a challenge to the appointment of an examiner in an Interstate Commerce Commission proceeding. 344 U.S. at 35. Therein the Court stated in dicta that this was not a defect "which deprives the Commission of power or jurisdiction, so that even in the absence of timely objection its order should be set aside as a nullity." *Id.* at 38. In *L. A. Tucker Truck Lines*, the challenge was not to the Commission's power to act, but only its examiner's. We held in *Railroad Yardmasters* that the *L. A. Tucker Truck Lines* rejection of the challenge did not govern because in the case before us, "the appellee contend[ed] that the National Mediation Board had no power to act at all at a time when there were two vacancies on the Board." 721 F.2d at 1338. Because that challenge "present[ed] a question of power or jurisdiction . . . [it was] open to the appellee even if not initially asserted before the Board." *Id.*

The reasoning of *Yardmasters* is applicable here. As in *Yardmasters*, the objections before us concerning lack of a quorum raise questions that go to the very power of the Board to act and implicate fundamental separation of powers concerns. We hold that they are governed by the "extraordinary circumstances" exception to the 29 U.S.C. § 160(e) requirement and therefore are properly before us for review.

Admittedly, *Yardmasters* did not implicate our jurisdiction nor have we ever applied it to a jurisdictional exhaustion statute. But in *Natural Resources Defense Council v. Thomas*, we considered whether to apply *Yardmasters* to section 307(d)(7)(B) of the Clean Air Act, 42 U.S.C. § 7607(d)(7)(B), a jurisdictional administrative exhaustion requirement. 805 F.2d 410, 428 & n.29 (D.C. Cir. 1986). Although we ultimately declined to apply it, we did so because the facts of the case did not involve the *Yardmasters* exception, not because *Yardmasters* does not apply to a jurisdictional exhaustion statute. *See id.* Confronted for the first time with facts that do trigger the *Yardmasters* exception in the context of a jurisdictional exhaustion statute, we hold that we may exercise jurisdiction under section 10(e) because a constitutional challenge to the Board's composition creates "extraordinary circumstances" excusing failure to raise it below.

In various circumstances, both this court and the Supreme Court have considered objections to the authority of the decisionmaker whose decision is under review even when those objections were not raised below. For example, the Supreme Court has stated, admittedly in dicta, that "if the Board has patently traveled outside the orbit of its authority so that there is, legally speaking, no order to enforce," a reviewing court can not enter an order of enforcement, such as the Board seeks in this case. *NLRB v. Cheney California Lumber Co.*, 327 U.S. 385, 388 (1946). It is true that petitioner's argument before us does not raise the Board's "travel[ing] outside the orbit of its authority" in precisely the same way as in *Cheney*. In that case, the Supreme Court addressed arguments concerning the scope of the Board's authority. Here, however, there is "no order to enforce" because there was no lawfully constituted Board. The *Cheney* order was "outside the orbit of authority" by reason of its scope. The present order is outside the orbit of the authority of the Board because the Board had no authority to issue any

order. It had no quorum. *See generally New Process Steel*, 130 S. Ct. 2635. This, we hold, constitutes an extraordinary circumstance within the meaning of the NLRA.

We further find instructive our decision in *Carroll College, Inc. v. NLRB*, 558 F.3d 568 (D.C. Cir. 2009). In that case, we considered an objection to the Board's authority to subject a religious institution to the NLRA's collective bargaining requirements. *Id.* at 571. In agreeing with the petitioner in *Carroll College* that the Board had erred, we stated, "[t]he Board thus had no jurisdiction to order the school to bargain with the union, and we have authority to invalidate the Board's order even though the college did not raise its jurisdictional challenge below." *Id.* at 574. Although for different reasons, the petitioner here, just as in *Carroll College*, argues that the Board was without authority to enter the order under review. Just as in *Carroll College*, we hold that where the Board "had no jurisdiction" to enter the order, "we have authority to invalidate the Board's order even though the [petitioner] did not raise its jurisdictional challenge below." *Id.*

## III. THE UNDERLYING PROCEEDINGS

Petitioner is a bottler and distributor of Pepsi-Cola products and is an employer within the terms of the NLRA. As discussed, an NLRB administrative law judge concluded that Noel Canning had violated the NLRA. Board Decision at 8 (ALJ Op.). After Noel Canning filed exceptions to the ALJ's findings, a three-member panel of the Board, composed of Members Hayes, Flynn, and Block, affirmed those findings in a decision dated February 8, 2012. *Id.* at 1 (Board Op.).

On that date, the Board purportedly had five members. Two members, Chairman Mark G. Pearce and Brian Hayes, had been confirmed by the Senate on June 22, 2010. It is undisputed

that they remained validly appointed Board members on February 8, 2012. *See* 156 Cong. Rec. S5,281 (daily ed. June 22, 2010).

The other three members were all appointed by the President on January 4, 2012, purportedly pursuant to the Recess Appointments Clause of the Constitution, U.S. Const. art. II, § 2, cl. 3. *See Ctr. for Soc. Change, Inc.*, 358 N.L.R.B. No. 24, slip op. at 1, 2012 WL 1064641 (2012).

The first of these three members, Sharon Block, filled a seat that became vacant on January 3, 2012, when Board member Craig Becker's recess appointment expired. *See* 158 Cong. Rec. S582–83 (daily ed. Feb. 13, 2012); Part IV.B, *infra*.

The second of the three members, Terence F. Flynn, filled a seat that became vacant on August 27, 2010, when Peter Schaumber's term expired. *See* 158 Cong. Rec. S582–83; 152 Cong. Rec. 17,077 (2006). The third, Richard F. Griffin, filled a seat that became vacant on August 27, 2011, when Wilma B. Liebman's term expired. *See* 158 Cong. Rec. S582–83; 152 Cong. Rec. 17,077.

At the time of the President's purported recess appointments of the three Board members, the Senate was operating pursuant to a unanimous consent agreement, which provided that the Senate would meet in *pro forma* sessions every three business days from December 20, 2011, through January 23, 2012. 157 Cong. Rec. S8,783–84 (daily ed. Dec. 17, 2011). The agreement stated that "no business [would be] conducted" during those sessions. *Id.* at S8,783. During the December 23 *pro forma* session, the Senate overrode its prior agreement by unanimous consent and passed a temporary extension to the payroll tax. *Id.* at S8,789 (daily ed. Dec. 23, 2011). During the January 3 *pro forma* session, the Senate acted to convene the

second session of the 112th Congress and to fulfill its constitutional duty to meet on January 3. 158 Cong. Rec. S1 (daily ed. Jan. 3, 2012); *see* U.S. Const. amend. XX, § 2 ("The Congress shall assemble at least once in every year, and such meeting shall begin at noon on the 3d day of January, unless they shall by law appoint a different day.").

Noel Canning asserts that the Board did not have a quorum for the conduct of business on the operative date, February 8, 2012. Citing *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), which holds that the Board cannot act without a quorum of three members, Noel Canning asserts that the Board lacked a quorum on that date. Noel Canning argues that the purported appointments of the last three members of the Board were invalid under the Recess Appointments Clause of the Constitution, Article II, Section 2, Clause 3. Because we agree that the appointments were constitutionally invalid and the Board therefore lacked a quorum, we grant the petition for review and vacate the Board's order.

## IV. ANALYSIS

It is undisputed that the Board must have a quorum of three in order to take action. It is further undisputed that a quorum of three did not exist on the date of the order under review unless the three disputed members (or at least one of them) were validly appointed. It is further agreed that the members of the Board are "Officers of the United States" within the meaning of the Appointments Clause of the Constitution, which provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. Const. art. II, § 2, cl.

2.  Finally, it is undisputed that the purported appointments of the three members were not made "by and with the Advice and Consent of the Senate."

This does not, however, end the dispute. The Board contends that despite the failure of the President to comply with Article II, Section 2, Clause 2, he nonetheless validly made the appointments under a provision sometimes referred to as the "Recess Appointments Clause," which provides that "[t]he President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." *Id.* art. II, § 2, cl. 3. Noel Canning contends that the putative recess appointments are invalid and the Recess Appointments Clause is inapplicable because the Senate was not in the recess at the time of the putative appointments and the vacancies did not happen during the recess of the Senate. We consider those issues in turn.

*A.  The Meaning of "the Recess"*

Noel Canning contends that the term "the Recess" in the Recess Appointments Clause refers to the intersession recess of the Senate, that is to say, the period between sessions of the Senate when the Senate is by definition not in session and therefore unavailable to receive and act upon nominations from the President. The Board's position is much less clear. It argues that the alternative appointment procedure created by that Clause is available during intrasession "recesses," or breaks in the Senate's business when it is otherwise in a continuing session. The Board never states how short a break is too short, under its theory, to serve as a "recess" for purposes of the Recess Appointments Clause. This merely reflects the Board's larger problem: it fails to differentiate between "recesses" and the actual constitutional language, "the Recess."

It is this difference between the word choice "recess" and "the Recess" that first draws our attention. When interpreting a constitutional provision, we must look to the natural meaning of the text as it would have been understood at the time of the ratification of the Constitution. *District of Columbia v. Heller*, 128 S. Ct. 2783, 2788 (2008). Then, as now, the word "the" was and is a definite article. *See* 2 Samuel Johnson, A Dictionary of the English Language 2041 (1755) (defining "the" as an "article noting a *particular* thing" (emphasis added)). Unlike "a" or "an," that definite article suggests specificity. As a matter of cold, unadorned logic, it makes no sense to adopt the Board's proposition that when the Framers said "the Recess," what they really meant was "a recess." This is not an insignificant distinction. In the end it makes all the difference.

Six times the Constitution uses some form of the verb "adjourn" or the noun "adjournment" to refer to breaks in the proceedings of one or both Houses of Congress. Twice, it uses the term "the Recess": once in the Recess Appointments Clause and once in the Senate Vacancies Clause, U.S. Const. art. I, § 3, cl. 2. Not only did the Framers use a different word, but none of the "adjournment" usages is preceded by the definite article. All this points to the inescapable conclusion that the Framers intended something specific by the term "the Recess," and that it was something different than a generic break in proceedings.

The structure of the Clause is to the same effect. The Clause sets a time limit on recess appointments by providing that those commissions shall expire "at the End of their [the Senate's] next Session." Again, the Framers have created a dichotomy. The appointment may be made in "the Recess," but it ends at the end of the next "Session." The natural interpretation of the Clause is that the Constitution is noting a difference between "the Recess" and the "Session." Either the

Senate is in session, or it is in the recess. If it has broken for three days within an ongoing session, it is not in "the Recess."

It is universally accepted that "Session" here refers to the usually two or sometimes three sessions per Congress. Therefore, "the Recess" should be taken to mean only times when the Senate is not in one of those sessions. *Cf. Virginia v. Tennessee*, 148 U.S. 503, 519 (1893) (interpreting terms "by reference to associated words"). Confirming this reciprocal meaning, the First Congress passed a compensation bill that provided the Senate's engrossing clerk "two dollars per day during the session, with the like compensation to such clerk while he shall be necessarily employed in the recess." Act of Sept. 22, 1789, ch. 17, § 4, 1 Stat. 70, 71.

Not only logic and language, but also constitutional history supports the interpretation advanced by Noel Canning, not that of the Board. When the Federalist Papers spoke of recess appointments, they referred to those commissions as expiring "at the end of the ensuing session." The Federalist No. 67, at 408 (Clinton Rossiter ed., 2003). For there to be an "ensuing session," it seems likely to the point of near certainty that recess appointments were being made at a time when the Senate was not in session — that is, when it was in "the Recess." Thus, background documents to the Constitution, in addition to the language itself, suggest that "the Recess" refers to the period between sessions that would end with the ensuing session of the Senate.

Further, the Supreme Court has used analogous state constitutional provisions to inform its interpretation of the Constitution. *See Heller*, 128 S. Ct. at 2802. For example, in *Collins v. Youngblood*, the Court considered several early state constitutions in discerning "the original understanding of the *Ex Post Facto* Clause" because "they appear to have been a basis

for the Framers' understanding of the provision." 497 U.S. 37, 43 (1990). The North Carolina Constitution, which contains the state constitutional provision most similar to the Recess Appointments Clause and thus likely served as the Clause's model, *see* Thomas A. Curtis, Note, *Recess Appointments to Article III Courts: The Use of Historical Practice in Constitutional Interpretation*, 84 Colum. L. Rev. 1758, 1770–72 (1984), supports the intersession interpretation. It provides:

> That in every case where any officer, the right of whose appointment is by this Constitution vested in the General Assembly, shall, during their recess, die, or his office by other means become vacant, the Governor shall have power, with the advice of the Council of State, to fill up such vacancy, by granting a temporary commission, which shall expire at the end of the next session of the General Assembly.

N.C. Const. of 1776, art. XX, *reprinted in* 7 Sources and Documents of United States Constitutions 406 (1978). This provision, like the Recess Appointments Clause, describes a singular recess and does not use the word "adjournment." And an 1819 North Carolina Supreme Court case dealing with this provision implies that the provision was seen as differentiating between "the session of the General Assembly" and "the recess of the General Assembly." *Beard v. Cameron*, 7 N.C. (3 Mur.) 181 (1819) (opinion of Taylor, C.J.).

The Board argues that "the Company's view would . . . upend the established constitutional balance of power between the Senate and the President with respect to presidential appointments." Resp't. Br. at 13. However, the Board's view of "the established constitutional balance" is neither so well established nor so clear as the Board seems to think. In fact, the historical role of the Recess Appointments Clause is neither

clear nor consistent.

The interpretation of the Clause in the years immediately following the Constitution's ratification is the most instructive historical analysis in discerning the original meaning. Indeed, such early interpretation is a "critical tool of constitutional interpretation" because it reflects the "public understanding" of the text "in the period after its . . . ratification." *Heller*, 128 S. Ct. at 2804–05. With respect to the Recess Appointments Clause, historical practice strongly supports the intersession interpretation. The available evidence shows that no President attempted to make an intrasession recess appointment for 80 years after the Constitution was ratified. Michael A. Carrier, Note, *When is the Senate in Recess for Purposes of the Recess Appointments Clause?*, 92 Mich. L. Rev. 2204, 2211 (1994). The first intrasession recess appointment probably did not come until 1867, when President Andrew Johnson apparently appointed one district court judge during an intrasession adjournment. *See* Edward A. Hartnett, *Recess Appointments of Article III Judges: Three Constitutional Questions*, 26 Cardozo L. Rev. 377, 408–09 (2005). It is not even entirely clear that the Johnson appointment was made during an intrasession recess. *See id.* at 409 n.136.

Presidents made only three documented intrasession recess appointments prior to 1947, with the other two coming during the presidencies of Calvin Coolidge and Warren Harding. *See* Carrier*, supra*, at 2209–12, 2235; *see also Lawfulness of Recess Appointments During a Recess of the Senate Notwithstanding Periodic Pro Forma Sessions*, 36 Op. O.L.C. 1, 5 (2012), *available at* http://www.justice.gov/olc/2012/pro-forma-sessions-opinion.pdf ("2012 OLC Memo").

Whatever the precise number of putative intrasession recess appointments before 1947, it is well established that for at least

80 years after the ratification of the Constitution, no President attempted such an appointment, and for decades thereafter, such appointments were exceedingly rare. The Supreme Court in *Printz v. United States*, exploring the reach of federal power over the states, deemed it significant that the early Congress had not attempted to exercise the questioned power. 521 U.S. 898 (1997). Paralleling the Supreme Court's reasoning in *Printz*, we conclude that the infrequency of intrasession recess appointments during the first 150 years of the Republic "suggests an assumed *absence* of [the] power" to make such appointments. *Id.* at 908. Though it is true that intrasession recesses of significant length may have been far less common in those early days than today, *see* Carrier, *supra*, at 2211, it is nonetheless the case that the appointment practices of Presidents more nearly contemporaneous with the adoption of the Constitution do not support the propriety of intrasession recess appointments. Their early understanding of the Constitution is more probative of its original meaning than anything to be drawn from administrations of more recent vintage.

While the Board seeks support for its interpretation in the practices of more recent administrations, we do not find those practices persuasive. We note that in *INS v. Chadha*, when the Supreme Court was considering the constitutionality of a one-house veto, it considered a similar argument concerning the increasing frequency of such legislative veto provisions. 462 U.S. 919, 944–45 (1983). In rejecting that argument, the *Chadha* Court stated that "our inquiry is sharpened rather than blunted by the fact that congressional veto provisions are appearing with increasing frequency . . . ." *Id.* at 944. Like the Supreme Court in *Chadha*, we conclude that practice of a more recent vintage is less compelling than historical practice dating back to the era of the Framers.

Likewise, in *Myers v. United States*, the Court considered a statutory limitation on the President's power to remove his appointees. 272 U.S. 52 (1926). In a powerful tribute to the strength of interpretations from the time of the ratification, Chief Justice Taft, writing for the Court, gave almost dispositive weight to the First Congress's construction of the Constitution on the question of the President's removal power. *See id.* at 174–75. The Court expressly valued the early practice over recent 1870s legislation inconsistent with the early understanding.

The Constitution's overall appointments structure provides additional confirmation of the intersession interpretation. The Framers emphasized that the recess appointment power served only as a stopgap for times when the Senate was unable to provide advice and consent. Hamilton wrote in *Federalist No. 67* that advice and consent "declares the general mode of appointing officers of the United States," while the Recess Appointments Clause serves as "nothing more than a supplement to the other for the purpose of establishing an auxiliary method of appointment, in cases to which the general method was inadequate." The Federalist No. 67, *supra*, at 408. The "general mode" of participation of the Senate through advice and consent served an important function: "It would be an excellent check upon a spirit of favoritism in the President, and would tend greatly to prevent the appointment of unfit characters from State prejudice, from family connection, from personal attachment, or from a view to popularity." The Federalist No. 76, *supra*, at 456.

Nonetheless, the Framers recognized that they needed some temporary method for appointment when the Senate was in the recess. At the time of the Constitution, intersession recesses were regularly six to nine months, Michael B. Rappaport, *The Original Meaning of the Recess Appointments Clause*, 52 UCLA

L. Rev. 1487, 1498 (2005), and senators did not have the luxury of catching the next flight to Washington. To avoid government paralysis in those long periods when senators were unable to provide advice and consent, the Framers established the "auxiliary" method of recess appointments. But they put strict limits on this method, requiring that the relevant vacancies happen during "the Recess." It would have made little sense to extend this "auxiliary" method to any intrasession break, for the "auxiliary" ability to make recess appointments could easily swallow the "general" route of advice and consent. The President could simply wait until the Senate took an intrasession break to make appointments, and thus "advice and consent" would hardly restrain his appointment choices at all.

To adopt the Board's proffered intrasession interpretation of "the Recess" would wholly defeat the purpose of the Framers in the careful separation of powers structure reflected in the Appointments Clause. As the Supreme Court observed in *Freytag v. Commissioner of Internal Revenue*, "The manipulation of official appointments had long been one of the American revolutionary generation's greatest grievances against executive power, because the power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth century despotism." 501 U.S. 868, 883 (1991) (internal quotation marks and citation omitted). In short, the Constitution's appointments structure — the general method of advice and consent modified only by a limited recess appointments power when the Senate simply cannot provide advice and consent — makes clear that the Framers used "the Recess" to refer only to the recess between sessions.

Confirming this understanding of the Recess Appointments Clause is the lack of a viable alternative interpretation of "the Recess." The first alternative interpretation is that "the Recess" refers to all Senate breaks. But no party presses that

24

interpretation, and for good reason. *See* Resp't Br. at 65 (conceding that "a routine adjournment for an evening, a weekend, or a lunch break occurring during regular working sessions of the Senate does not constitute a 'Recess of the Senate' under the Recess Appointments Clause"). As discussed above, the appointments structure would have been turned upside down if the President could make appointments any time the Senate so much as broke for lunch. This interpretation also cannot explain the use of the definite article "the," the singular "Recess" in the Clause, or why the Framers used "adjournment" differently from "Recess."

The second possible interpretation is that "the Recess" is a practical term that refers to some substantial passage of time, such as a ten- or twenty-day break. Attorney General Daugherty seemed to abandon the intersession interpretation in 1921 and adopted this functional interpretation, arguing that "[t]o give the word 'recess' a technical and not a practical construction, is to disregard substance for form." 33 Op. Att'y Gen. 20, 22 (1921). Daugherty refused to put an exact time on the length of the break necessary for a "Recess," stating that "[i]n the very nature of things the line of demarcation can not be accurately drawn." *Id.* at 25.

We must reject Attorney General Daugherty's vague alternative in favor of the clarity of the intersession interpretation. As the Supreme Court has observed, when interpreting "major features" of the Constitution's separation of powers, we must "establish[] high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995). Thus, the inherent vagueness of Daugherty's interpretation counsels against it. Given that the appointments structure forms a major part of the separation of powers in the Constitution, the Framers

would not likely have introduced such a flimsy standard. Moreover, the text of the Recess Appointments Clause offers no support for the functional approach. Some undefined but substantial number of days-break is not a plausible interpretation of "the Recess."

A third alternative interpretation of "the Recess" is that it means any adjournment of more than three days pursuant to the Adjournments Clause. *See* U.S. Const. art. I, § 5, cl. 4 ("Neither House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days . . . ."). This interpretation lacks any constitutional basis. The Framers did not use the word "adjournment" in the Recess Appointments Clause. Instead, they used "the Recess." The Adjournments Clause and the Recess Appointments Clause exist in different contexts and contain no hint that they should be read together. Nothing in the text of either Clause, the Constitution's structure, or its history suggests a link between the Clauses. Without any evidence indicating that the two Clauses are related, we cannot read one as governing the other. We will not do violence to the Constitution by ignoring the Framers' choice of words.

The fourth and final possible interpretation of "the Recess," advocated by the Office of Legal Counsel, is a variation of the functional interpretation in which the President has discretion to determine that the Senate is in recess. *See* 2012 OLC Memo, *supra*, at 23 ("[T]he President therefore has discretion to conclude that the Senate is unavailable to perform its advise-and-consent function and to exercise his power to make recess appointments."). This will not do. Allowing the President to define the scope of his own appointments power would eviscerate the Constitution's separation of powers. The checks and balances that the Constitution places on each branch of government serve as "self-executing safeguard[s] against the encroachment or aggrandizement of one branch at the expense

of the other." *Buckley v. Valeo*, 424 U.S. 1, 122 (1976). An interpretation of "the Recess" that permits the President to decide when the Senate is in recess would demolish the checks and balances inherent in the advice-and-consent requirement, giving the President free rein to appoint his desired nominees at any time he pleases, whether that time be a weekend, lunch, or even when the Senate is in session and he is merely displeased with its inaction. This cannot be the law. The intersession interpretation of "the Recess" is the only one faithful to the Constitution's text, structure, and history.

The Board's arguments supporting the intrasession interpretation are not convincing. The Board relies on an Eleventh Circuit opinion holding that "the Recess" includes intrasession recesses. *See Evans v. Stephens*, 387 F.3d 1220, 1224 (11th Cir. 2004), *cert. denied*, 544 U.S. 942 (2005). The *Evans* court explained that contemporaneous dictionaries defined "recess" broadly as "remission and suspension of any procedure." *Id.* (quoting 2 Johnson, *supra*, at 1650). The court also dismissed the importance of the definite article "the," discounted the Constitution's distinction between "adjournment" and "Recess" by interpreting "adjournment" as a parliamentary *action*, and emphasized the prevalence of intrasession recess appointments in recent years. *See id.* at 1225–26.

While we respect our sister circuit, we find the *Evans* opinion unconvincing. Initially, we note that the Eleventh Circuit's analysis was premised on an incomplete statement of the Recess Appointments Clause's purpose: "to enable the President to fill vacancies to assure the proper functioning of our government." *Id.* at 1226. This statement omits a crucial element of the Clause, which enables the President to fill vacancies *only when the Senate is unable to provide advice and consent. See, e.g.*, 2012 OLC Memo, *supra*, at 10 ("[T]he recess appointment power is required to address situations in which the

Senate is unable to provide advice and consent on appointments."). As we have explained, the Clause deals with the Senate's being unable to provide advice and consent only during "the Recess," *viz.*, an intersession recess. As written, the Eleventh Circuit's statement disregards the full structure of the Constitution's appointments provision, which makes clear that the recess appointments method is secondary to the primary method of advice and consent. The very existence of the advice and consent requirement highlights the incompleteness of the Eleventh Circuit's broad statement of constitutional purpose.

Nor are we convinced by the Eleventh Circuit's more specific arguments. First, the natural meaning of "the Recess" is more limited than the broad dictionary definition of "recess." In context, "the Recess" refers to a specific state of the legislature, so sources other than general dictionaries are more helpful in elucidating the term's original public meaning. *See Virginia*, 148 U.S. at 519 ("[T]he meaning of a term may be enlarged or restrained by reference to the object of the whole clause in which it is used."). Indeed, it is telling that even the Board concedes that "Recess" does not mean *all* breaks, *see* Resp't Br. at 65, which is the interpretation suggested by the dictionary definition. *See* 2 Johnson, *supra*, at 1650 (defining "recess" as the "remission and suspension of any procedure").

Second, the Eleventh Circuit fails to explain the use of the singular "Recess," and it underestimates the significance of the definite article "the" preceding "Recess" by relying on twentieth-century dictionaries to argue that "the" can come before a generic term. *See Evans*, 387 F.3d at 1224–25. Contemporaneous dictionaries treated "the" as "noting a *particular* thing." 2 Johnson, *supra*, at 2041 (emphasis added).

Third, as the Eleventh Circuit acknowledged, the Supreme Court has suggested that the Constitution does not in fact only

use "adjournment" to denote parliamentary action. *See Evans*, 387 F.3d at 1225 (citing *Wright v. United States*, 302 U.S. 583 (1938)).

In fact, the Constitution uses "adjournment" to refer generally to legislative breaks. It uses "the Recess" differently and then incorporates the definite article. Thus, the Eleventh Circuit's interpretation of "adjournment" fails to distinguish between "adjournment" and "Recess," rendering the latter superfluous and ignoring the Framers' specific choice of words. *Cf. Holmes v. Jennison*, 39 U.S. (14 Pet.) 540, 570–71 (1840) (plurality opinion) ("In expounding the Constitution of the United States, every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added."); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect . . . .").

The Board offers as an example of an early interpretation of "the Recess" consistent with its view the case of a senator appointed by the governor of New Jersey to fill a vacated seat in the United States Senate pursuant to Article I, Section 3, Clause 2. Under that clause, "if Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies." U.S. Const. art. I, § 3, cl. 2. In the example relied upon by the Board, Franklin Davenport was "appointed a Senator by the Executive of the State of New Jersey, in the recess of the Legislature" and "took his seat in the Senate." 8 Annals of Cong. 2197 (1798). The Board then offers evidence that the New Jersey Legislative Council Journal, 23d Session 20–21 (1798–99), documents an intrasession recess at the apparent time of Davenport's appointment. We do not find this

persuasive. Nothing in the Annals of Congress establishes that Congress considered or even knew that the appointment was made during an intrasession recess of the legislature. The example offers at most the understanding of one state governor, not a common understanding of "the Recess" as used in the Recess Appointments Clause.

Finally, we would make explicit what we have implied earlier. The dearth of intrasession appointments in the years and decades following the ratification of the Constitution speaks far more impressively than the history of recent presidential exercise of a supposed power to make such appointments. Recent Presidents are doing no more than interpreting the Constitution. While we recognize that all branches of government must of necessity exercise their understanding of the Constitution in order to perform their duties faithfully thereto, ultimately it is our role to discern the authoritative meaning of the supreme law.

As Chief Justice Marshall made clear in *Marbury v. Madison*, "[i]t is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each." 5 U.S. (1 Cranch) at 177. In *Marbury*, the Supreme Court established that if the legislative branch has acted in contravention of the Constitution, it is the courts that make that determination. In *Youngstown Sheet & Tube Co. v. Sawyer*, the Supreme Court made clear that the courts must make the same determination if the executive has acted contrary to the Constitution. 343 U.S. 579 (1952). That is the case here, and we must strike down the unconstitutional act.

In short, we hold that "the Recess" is limited to intersession recesses. The Board conceded at oral argument that the appointments at issue were not made during the intersession recess: the President made his three appointments to the Board on January 4, 2012, after Congress began a new session on January 3 and while that new session continued. 158 Cong. Rec. S1 (daily ed. Jan. 3, 2012). Considering the text, history, and structure of the Constitution, these appointments were invalid from their inception. Because the Board lacked a quorum of three members when it issued its decision in this case on February 8, 2012, its decision must be vacated. *See* 29 U.S.C. § 153(b); *New Process Steel*, 130 S. Ct. at 2644–45.

## B. Meaning of "Happen"

Although our holding on the first constitutional argument of the petitioner is sufficient to compel a decision vacating the Board's order, as we suggested above, we also agree that the petitioner is correct in its understanding of the meaning of the word "happen" in the Recess Appointments Clause. The Clause permits only the filling up of "Vacancies that may happen during the Recess of the Senate." U.S. Const. art. II, § 2, cl. 3. Our decision on this issue depends on the meaning of the constitutional language "that may happen during the Recess." The company contends that "happen" means "arise" or "begin" or "come into being." The Board, on the other hand, contends that the President may fill up any vacancies that "happen to exist" during "the Recess." It is our firm conviction that the appointments did not occur during "the Recess." We proceed now to determine whether the appointments are also invalid as the vacancies did not "happen" during "the Recess."

In determining the meaning of "happen" in the Recess Appointments Clause, we begin our analysis as we did in the first issue by looking to the natural meaning of the text as it

would have been understood at the time of the ratification of the Constitution. *See Heller*, 128 S. Ct. at 2788. Upon a simple reading of the language itself, we conclude that the word "happen" could not logically have encompassed any vacancies that happened to exist during "the Recess." If the language were to be construed as the Board advocates, the operative phrase "that may happen" would be wholly unnecessary. Under the Board's interpretation, the vacancy need merely exist during "the Recess" to trigger the President's recess appointment power. The Board's interpretation would apply with equal force, however, irrespective of the phrase "that may happen." Its interpretation therefore deprives that phrase of any force. By effectively reading the phrase out of the Clause, the Board's interpretation once again runs afoul of the principle that every phrase of the Constitution must be given effect. *See Marbury*, 5 U.S. (1 Cranch) at 174 ("It cannot be presumed that any clause in the constitution is intended to be without effect . . . .").

For our logical analysis of the language with respect to the meaning of "happen" to be controlling, we must establish that it is consistent with the understanding of the word contemporaneous with the ratification. Dictionaries at the time of the Constitution defined "happen" as "[t]o fall out; to chance; to come to pass." 1 Johnson, *supra*, at 965; *see also Evans*, 387 F.3d at 1230 & n.4 (Barkett, J., dissenting) (surveying a variety of eighteenth-century dictionaries and concluding that they all defined "happen" similarly). A vacancy happens, or "come[s] to pass," only when it first arises, demonstrating that the Recess Appointments Clause requires that the relevant vacancy arise during the recess. The term "happen" connotes an event taking place — an action — and it would be plainly incorrect to say that an event happened during some period of time when in fact it happened before that time.

In addition to the logic of the language, there is ample other support for this conclusion. First, we repair again to examination of the structure of the Constitution. If we accept the Board's construction, we eviscerate the primary mode of appointments set forth in Article II, Section 2, Clause 2. It would have made little sense to make the primary method of appointment the cumbersome advice and consent procedure contemplated by that Clause if the secondary method would permit the President to fill up all vacancies regardless of when the vacancy arose. A President at odds with the Senate over nominations would never have to submit his nominees for confirmation. He could simply wait for a "recess" (however defined) and then fill up all vacancies.

We further note that the "arise" interpretation is consistent with other usages of "happen" in the Constitution. Article I, Section 3, Clause 2, the Senate Vacancies Clause, provides for the filling of vacancies in Senate seats. Though now amended, at the time of the adoption of the Constitution, that section stated: "if Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies." U.S. Const. art. I, § 3, cl. 2. That Clause makes sense if "happen . . . during the Recess" refers to arising or coming into being during "the Recess." If it merely means that the vacancy happens to exist at the time of a recess, it becomes implausible.

Our construction of "happen" as meaning "arise" in the Recess Appointments Clause is consistent with the use of the same wording in the Senate Vacancies Clause. It is well established that "inconsistency [within the Constitution] is to be implied only where the context clearly requires it." *Nat'l Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 587 (1949).

Our understanding of the plain meaning of the Recess Appointments Clause as requiring that a qualifying vacancy must have come to pass or arisen "during the Recess" is consistent with the apparent meaning of the Senate Vacancies Clause. The interpretation proffered by the Board is not.

As with the first issue, we also find that evidence of the earliest understanding of the Clause is inconsistent with the Board's position. It appears that the first President, who took office shortly after the ratification, understood the recess appointments power to extend only to vacancies that arose during senatorial recess. More specifically, President Washington followed a practice that strongly suggests that he understood "happen" to mean "arise." If not enough time remained in the session to ask a person to serve in an office, President Washington would nominate a person without the nominee's consent, and the Senate would confirm the individual before recessing. *See* Rappaport, *supra*, at 1522. Then, if the person declined to serve during the recess, thereby creating a new vacancy during the recess, President Washington would fill the position using his recess appointment power. *Id.* If President Washington and the early Senate had understood the word "happen" to mean "happen to exist," this convoluted process would have been unnecessary.

In 1792, Edmund Randolph, the first Attorney General, addressed the issue of an office that had become vacant during the session when the Secretary of State sought his view. Edmund Randolph, Opinion on Recess Appointments (July 7, 1792), *in* 24 The Papers of Thomas Jefferson 165, 165–67 (John Catanzariti et al. eds., 1990) ("Randolph Opinion"). Addressing the vacancy, concluding that it did not "happen" during the recess, and thereby rejecting the "exist" interpretation, Randolph wrote:

> But is it a vacancy which has *happened* during the recess of the Senate? It is now the same and no other vacancy, than that, which existed on the 2nd. of April 1792. It commenced therefore on that day or may be said to have *happened* on that day.

*Id.* at 166.

Alexander Hamilton, similarly, wrote that "[i]t is clear, that independent of the authority of a special law, the President cannot fill a vacancy which happens during a session of the Senate." Letter from Alexander Hamilton to James McHenry (May 3, 1799), *in* 23 The Papers of Alexander Hamilton 94, 94 (Harold C. Syrett ed., 1976); *see also* The Federalist No. 67, *supra*, at 408 (explaining the purpose of the Clause by stating that "vacancies might happen *in their recess*" (emphasis in original)). In March 1814, Senator Christopher Gore argued that the Clause's scope is limited to "vacanc[ies] that may happen during the recess of the Senate":

> If the vacancy happens at another time, it is not the case described by the Constitution; for that specifies the precise space of time wherein the vacancy must happen, and the times which define this period bring it emphatically within the ancient and well-established maxim: "Expressio unius est exclusio alterius."

26 Annals of Cong. 653 (1814); *see United States v. Wells Fargo Bank*, 485 U.S. 351, 357 (1988) (defining the interpretive canon of "expressio unius est exclusio alterius" as "the expression of one is the exclusion of others" (italics omitted)).

Additional support for the "arise" interpretation comes from early interpreters who understood that the Clause only applied to vacancies where the office had previously been occupied, as

opposed to vacancies that existed because the office had been newly created.  Justice Joseph Story explained that "[t]he word 'happen' had relation to some casualty," a statement consistent with the arise interpretation.  3 Joseph Story, Commentaries on the Constitution § 1553 (1833) ("Story's Commentaries"), *reprinted in* 4 The Founders' Constitution 122 (Philip B. Kurland & Ralph Lerner eds., 1987).

We recognize that some circuits have adopted the "exist" interpretation.  *See Evans*, 387 F.3d at 1226–27; *United States v. Woodley*, 751 F.2d 1008, 1012–13 (9th Cir. 1985); *United States v. Allocco*, 305 F.2d 704, 709–15 (2d Cir. 1962).  Those courts, however, did not focus their analyses on the original public meaning of the word "happen."  In arguing that happen could mean "exist," the *Evans* majority used a modern dictionary to define "happen" as "befall," and then used the same modern dictionary to define "befall" as "happen to be." *See* 387 F.3d at 1226 (quoting 6 Oxford English Dictionary 1096 (2d ed. 1989); 2 *id.* at 62).  As the *Evans* dissent argued, "[t]his is at best a strained effort to avoid the available dictionary evidence." *Id.* at 1230 n.4 (Barkett, J., dissenting).  A modern cross-reference is not a contemporary definition.  The Board has offered no dictionaries from the time of the ratification that define "happen" consistently with the proffered definition of "happen to exist."

The *Evans* majority also relied on a handful of recess appointments supposedly made by Presidents Washington and Jefferson to offices that became vacant prior to the recess.  *Id.* at 1226 (majority opinion).  Subsequent scholarship, however, has demonstrated that these appointments were "in fact examples of the practice of appointing an individual without his consent and then, if he turns down the appointment during the recess, making a recess appointment at that time." Rappaport, *supra*, at 1522 n.97.  Again, as with the appointments by

President Washington referenced above, the use of this convoluted method of appointment demonstrates that early interpreters read "happen" as "arise."

The *Evans*, *Woodley*, and *Allocco* courts all relied on supposed congressional acquiescence in the practice of making recess appointments to offices that were vacant prior to the recess because 5 U.S.C. § 5503 permits payment to such appointees in some circumstances. *See Evans*, 387 F.3d at 1226–27; *Woodley*, 751 F.2d at 1013; *Allocco*, 305 F.2d at 715 (referring to § 5503's predecessor statute); *see also* 5 U.S.C. § 5503 (denying recess appointees payment "if the vacancy [they filled] existed while the Senate was in session," subject to certain exceptions).

Section 5503 was passed in 1966. Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 378, 475. Its similar predecessor statute was passed in 1940. Act of July 11, 1940, ch. 580, 54 Stat. 751. The enactment of statutes in 1940 and 1966 sheds no light on the original understanding of the Constitution. This is particularly true as prior statutes refused payments of salaries to all recess appointees whose vacancies arose during the session. *See* Act of Feb. 9, 1863, ch. 25, § 2, 12 Stat. 642, 646 (stating that no "money [shall] be paid out of the Treasury, as salary, to any person appointed during the recess of the Senate, to fill a vacancy in any existing office, which vacancy existed while the Senate was in session and is by law required to be filled by and with the advice and consent of the Senate, until such appointee shall have been confirmed by the Senate"); 5 U.S.C. § 56 (1934). We doubt that our sister circuits are correct in construing this legislation as acquiescent. The Framers placed the power of the purse in the Congress in large part because the British experience taught that the appropriations power was a tool with which the legislature could resist "the overgrown prerogatives of the other branches of government." The

Federalist No. 58, *supra*, at 357. The 1863 Act constitutes precisely that: resistance to executive aggrandizement. In any event, if the Constitution does not empower the President to make the appointments, "[n]either Congress nor the Executive can agree to waive . . . structural protection[s]" in the Appointments Clause. *Freytag*, 501 U.S. at 880; *cf. Chadha*, 462 U.S. at 942 n.13 ("The assent of the Executive to a bill which contains a provision contrary to the Constitution does not shield it from judicial review.").

As we recalled in our analysis of the first issue, "[i]t is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule." *Marbury*, 5 U.S. (1 Cranch) at 177. The Senate's desires do not determine the Constitution's meaning. The Constitution's separation of powers features, of which the Appointments Clause is one, do not simply protect one branch from another. *See Freytag*, 501 U.S. at 878. These structural provisions serve to protect the *people*, for it is ultimately the people's rights that suffer when one branch encroaches on another. As Madison explained in *Federalist No. 51*, the division of power between the branches forms part of the "security [that] arises to the rights of the people." The Federalist No. 51, *supra*, at 320. Or as the Supreme Court held in *Freytag*, "The structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic." 501 U.S. at 880. In short, nothing in 5 U.S.C. § 5503 changes our view that the original meaning of "happen" is "arise."

Our sister circuits and the Board contend that the "arise" interpretation fosters inefficiencies and leaves open the possibility of just what is occurring here — that is, a Board that cannot act for want for a quorum. The Board also suggests more dire consequences, arguing that failure to accept the "exist"

interpretation will leave the President unable to fulfill his chief constitutional obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and even suggests that the interpretation we adopt today could pose national security risks. *See Noel Canning v. NLRB*, No. 12-1115, Oral Argument Tr. at 52 (D.C. Cir. Dec. 5, 2012). But if Congress wished to alleviate such problems, it could certainly create Board members whose service extended until the qualification of a successor, or provide for action by less than the current quorum, or deal with any inefficiencies in some other fashion. And our suggestion that Congress can address this issue is no mere hypothesis. The two branches have repeatedly, and thoroughly, addressed the problems of vacancies in the executive branch. Congress has provided for the temporary filling of a vacancy in a particular executive office by an "acting" officer authorized to perform all of the duties and exercise all of the powers of that office, *see, e.g.*, 28 U.S.C. § 508 (Attorney General); 29 U.S.C. § 552 (Secretary of Labor), including key national security positions. *See, e.g.*, 10 U.S.C. § 132(b) (Secretary of Defense); *id.* § 154(d), (e) (Chairman, Joint Chiefs of Staff); 50 U.S.C. § 403-3a(a) (Director of National Intelligence); *id.* § 403-4c(b)(2) (Director of Central Intelligence Agency); *see also* S. Rep. No. 105-250, at 16–17 (1998) (listing other provisions). Moreover, Congress statutorily addressed the filling of vacancies in the executive branch not otherwise provided for. *See* 5 U.S.C. §§ 3345–3349d.

Congress has also addressed the problem of vacancies on various multimember agencies, providing that members may continue to serve for some period past the expiration of their commissions until successors are nominated and confirmed. *See, e.g.*, 7 U.S.C. § 2(a)(2)(A) (Commodities Futures Trading Commission); 15 U.S.C. § 78d(a) (Securities and Exchange Commission); 42 U.S.C. § 7171(b)(1) (Federal Energy

Regulatory Commission); 47 U.S.C. § 154(c) (Federal Communications Commission). And we have cited only a fraction of the multimember boards for which Congress has provided such potential extensions.

Admittedly, Congress has chosen not to provide for acting NLRB members. *See* 5 U.S.C. § 3349c(1)(A). But that choice cannot support the Board's interpretation of the Clause. We cannot accept an interpretation of the Constitution completely divorced from its original meaning in order to resolve exigencies created by — and equally remediable by — the executive and legislative branches. And as the Supreme Court expressly noted in *New Process Steel*, in the context of the Board, "[i]f Congress wishes to allow the Board to decide cases with only two members, it can easily do so." 130 S. Ct. at 2645.

In any event, if some administrative inefficiency results from our construction of the original meaning of the Constitution, that does not empower us to change what the Constitution commands. As the Supreme Court observed in *INS v. Chadha*, "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." 462 U.S. at 944. It bears emphasis that "[c]onvenience and efficiency are not the primary objectives — or the hallmarks — of democratic government." *Id.*

The power of a written constitution lies in its words. It is those words that were adopted by the people. When those words speak clearly, it is not up to us to depart from their meaning in favor of our own concept of efficiency, convenience, or facilitation of the functions of government. In light of the extensive evidence that the original public meaning of "happen" was "arise," we hold that the President may only make recess appointments to fill vacancies that arise during the recess.

Applying this rule to the case before us, we further hold that the relevant vacancies did not arise during the intersession recess of the Senate. The three Board seats that the President attempted to fill on January 4, 2012, had become vacant on August 27, 2010, August 27, 2011, and January 3, 2012, respectively. *See* Part III, *supra* (showing the dates for Chairman Liebman and Members Schaumber and Becker's departures). On August 27, 2010, the Senate was in the midst of an intrasession recess, so the vacancy that arose on that date did not arise during "the Recess" for purposes of the Recess Appointments Clause. *See* Congressional Directory for the 112th Congress 538 (2011). Similarly, the Senate was in an intrasession recess on August 27, 2011, so the vacancy that arose on that date also did not qualify for a recess appointment. *See id.*

The seat formerly occupied by Member Becker became vacant at the "End" of the Senate's session on January 3, 2012 — it did not "happen during the Recess of the Senate." First, this vacancy could not have arisen during an intersession recess because the Senate did not take an intersession recess between the first and second sessions of the 112th Congress.

It has long been the practice of the Senate, dating back to the First Congress, to conclude its sessions and enter "the Recess" with an adjournment *sine die*.[1] The Senate has followed

---

[1] *See* Congressional Directory for the 112th Congress, *supra*, at 522–38 (listing all of the Senate's intersession recesses prior to 2012); *see, e.g.*, 156 Cong. Rec. S11,070 (daily ed. Dec. 22, 2010) (concluding Second Session of 111th Congress with adjournment *sine die*); 147 Cong. Rec. 27,953 (2001) (concluding First Session of 107th Congress with adjournment *sine die*); 139 Cong. Rec. 32,433 (1993) (concluding First Session of 103d Congress with adjournment *sine die*); 128 Cong. Rec. 33,629 (1982) (concluding Second Session of the

this practice even for relatively brief intersession recesses.[2]

97th Congress with adjournment *sine die*); 125 Cong. Rec. 37,605 (1979) (concluding First Session of 96th Congress with adjournment *sine die*); 117 Cong. Rec. 47,658 (1971) (concluding First Session of the 92d Congress with adjournment *sine die*); 105 Cong. Rec. 19,688 (1959) (concluding First Session of 86th Congress with adjournment *sine die*); 91 Cong. Rec. 12,525 (1945) (concluding First Session of 79th Congress with adjournment *sine die*); 65 Cong. Rec. 11,202 (1924) (concluding First Session of 68th Congress with adjournment *sine die*); 45 Cong. Rec. 9,080 (1910) (concluding Second Session of 61st Congress with adjournment *sine die*); 23 Cong. Rec. 7,081 (1892) (concluding First Session of 52d Congress with adjournment *sine die*); Cong. Globe, 42d Cong., 2d Sess. 4,504 (1872) (concluding Second Session of 42d Congress with adjournment *sine die*); Cong. Globe, 23d Cong., 1st Sess. 480 (1834) (concluding First Session of 23d Congress with adjournment *sine die*); 29 Annals of Cong. 372 (1816) (concluding First Session of 14th Congress with adjournment *sine die*); 3 Annals of Cong. 668 (1793) (concluding Second Session of 2d Congress with adjournment *sine die*); 2 Annals of Cong. 1786 (1791) (concluding Third Session of 1st Congress with adjournment *sine die*).

[2] *See, e.g.*, 154 Cong. Rec. 24,808 (2009) (concluding Second Session of 110th Congress and entering three-day intersession recess with adjournment *sine die*); 141 Cong. Rec. 38,608 (1996) (concluding First Session of 104th Congress and entering momentary intersession recess with adjournment *sine die*); 137 Cong. Rec. 36,364 (1992) (concluding First Session of 102d Congress with adjournment *sine die* at the same time that the Second Session began); 109 Cong. Rec. 25,674 (1963) (concluding First Session of 88th Congress and entering eight-day intersession recess with adjournment *sine die*); 96 Cong. Rec. 17,121 (1951) (concluding Second Session of 81st Congress and entering one-day intersession recess with adjournment *sine die*); 94 Cong. Rec. 10,264 (1948) (concluding Second Session of 80th Congress and entering three-day intersession recess with adjournment *sine die*); 87 Cong. Rec. 10,143 (1942) (concluding First Session of 77th Congress and entering three-day intersession recess with adjournment *sine die*); 76 Cong. Rec. 5,656 (1933) (concluding Second Session of 72d Congress and entering one-day intersession

Indeed, various acts of Congress refer to the adjournment *sine die* as the conclusion of the session. *See, e.g.*, 2 U.S.C. § 682(5) (for purpose of congressional budget consideration, "continuity of a session of the Congress shall be considered as broken only by an adjournment of the Congress sine die"); 5 U.S.C. § 906(b)(1) (for purpose of agency reorganization plans, "continuity of session is broken only by an adjournment of Congress sine die").

We find a recent example of this longstanding practice, with dates nearly identical to those in this case, to be particularly instructive. On December 31, 2007, the Senate met in *pro forma* session and concluded the First Session of the 110th Congress, and entered "the Recess," with an adjournment *sine die*. *See* Congressional Directory for the 112th Congress, *supra*, at 537 (confirming that the First Session of the 110th Congress ended on December 31, 2007); 153 Cong. Rec. 36,508 (2007) (adjourning Senate *sine die*). It then convened the Second Session of the 110th Congress with a *pro forma* session on January 3, 2008. *See* Congressional Directory for the 112th Congress, *supra*, at 537 (confirming that the Second Session of the 110th Congress began on January 3, 2008); 154 Cong. Rec. 2 (2008) (convening Second Session).

Because, in this case, the Senate declined to adjourn *sine die* on December 30, 2011, it did not enter an intersession recess, and the First Session of the 112th Congress expired simultaneously with the beginning of the Second Session. *See, e.g.*, 86 Cong. Rec. 14,059 (1941) (noting that, in the absence of an adjournment *sine die* on January 3, 1941, "[t]he third session of the Seventy-sixth Congress expired automatically, under constitutional limitation, when the hour of 12 o'clock arrived").

recess with adjournment *sine die*).

43

Although the December 17, 2011, scheduling order specifically provided that the Second Session of the 112th Congress would convene on January 3, 2012, *see* 157 Cong. Rec. S8,783 (daily ed. Dec. 17, 2011), it did not specify when the First Session would conclude. And, at the last *pro forma* session before the January 3, 2012, session, the Senate adjourned to a date certain: January 3, 2012. *See* 157 Cong. Rec. S8,793 (daily ed. Dec. 30, 2011). Because the Senate did not adjourn *sine die*, it did not enter "the Recess" between the First and Second Sessions of the 112th Congress. Becker's appointment therefore expired at the end of the First Session on January 3, 2012, and the vacancy in that seat could not have "happen[ed]" during "the Recess" of the Senate.

Second, in any event, the Clause states that a recess appointment expires "at the End of [the Senate's] next Session," U.S. Const. art. II, § 2, cl. 3, not "at the beginning of the Senate's next Recess." Likewise, the structure of Article II, Section 2 supports this reading, for "it makes little sense to allow a second consecutive recess appointment for the same position, because the President and the Senate would have had an entire Senate session during the first recess appointment to nominate and confirm a permanent appointee." Rappaport, *supra*, at 1509. The January 3, 2012, vacancy thus did not arise during the recess, depriving the President of power to make an appointment under the Recess Appointments Clause. Because none of the three appointments were valid, the Board lacked a quorum and its decision must be vacated. *See* 29 U.S.C. § 153(b); *New Process Steel*, 130 S. Ct. at 2644–45.

Even if the "End" of the session were "during the Recess," meaning that the January 3, 2012, vacancy arose during some imaginary recess, we hold that the appointment to that seat is invalid because the President must make the recess appointment during the same intersession recess when the

vacancy for that office arose. The Clause provides that a recess appointee's commission expires at "the End of [the Senate's] next Session," which the Framers understood as "the end of the *ensuing* session." The Federalist No. 67, *supra*, at 408 (emphasis added).

Consistent with the structure of the Appointments Clause and the Recess Appointments Clause exception to it, the filling up of a vacancy that happens during a recess must be done during the same recess in which the vacancy arose. There is no reason the Framers would have permitted the President to wait until some future intersession recess to make a recess appointment, for the Senate would have been sitting in session during the intervening period and available to consider nominations. The earliest authoritative commentary on the Constitution explains that the purpose of the Recess Appointments Clause was to give the President authorization "to make temporary appointments during the recess, which should expire, when the senate should have had an opportunity to act on the subject." Story's Commentaries, *supra*, § 1551, *reprinted in* 4 The Founders' Constitution, *supra*, at 122; *see also Evans*, 387 F.3d at 1233 (Barkett, J., dissenting).

As with the first issue, we hold that the petitioner's understanding of the constitutional provision is correct, and the Board's is wrong. The Board had no quorum, and its order is void.

## V. THE MOTION FOR INTERVENTION

As we referenced early in this opinion, we have before us a motion for intervention. The Chamber of Commerce and the Coalition for a Democratic Workplace seek to intervene. It is the law of this circuit that litigants seeking to intervene in cases involving direct review of administrative actions must

establish Article III standing. *See Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 538–39 (D.C. Cir. 1999). Our judicial power is limited to "Cases" or "Controversies," U.S. Const. art. III, § 2, cl. 1, meaning that litigants must show "(1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551 (1996).

The movants claim to have "associational standing." In that context, the Supreme Court has explained that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

We need not decide the question of the movants' standing. Our precedent is clear: "[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case." *Ry. Labor Execs.' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993) (per curiam); *see also Doe v. Bolton*, 410 U.S. 179, 189 (1973) ("We conclude that we need not pass upon the status of these additional appellants in this suit, for the issues are sufficiently and adequately presented by [the original appellants], and nothing is gained or lost by the presence or absence of [the additional appellants].").

Noel Canning has standing. The case, like other petitions for review of administrative adjudications, proceeded between the party to the administrative adjudication and the

agency. We reached our decision. The motion is now moot, and we order it dismissed. The Chamber could have had its say by filing as an amicus, but for reasons satisfactory to itself, chose to attempt a strained claim of intervenor status.

## CONCLUSION

For the reasons set forth above, we grant the petition of Noel Canning and vacate the Board's order. We deny the cross-petition of the Board for enforcement of its invalid order.

*So ordered.*

GRIFFITH, *Circuit Judge*, concurring in the opinion except as to Part IV.B and concurring in the judgment:

The majority acknowledges that our holding on intrasession recess appointments is sufficient to vacate the Board's order, *see supra* slip op. at 30, and I would stop our constitutional analysis there. If we need not take up a constitutional issue, we should not. *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (noting the "deeply rooted commitment not to pass on questions of constitutionality unless adjudication of the constitutional issue is necessary" (internal quotation marks omitted)); *Dames & Moore v. Regan*, 453 U.S. 654, 660-61 (1981) (highlighting the Court's "attempt to confine the opinion to the very questions necessary to decision of the case"); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring) ("The Court will not 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" (quoting *Liverpool, N.Y. & Phila. S.S. Co. v. Comm'rs of Emigration*, 113 U.S. 33, 39 (1885))). I agree that the Executive's view that the President can fill vacancies that "happen to exist" during "the Recess" is suspect, but that position dates back to at least the 1820s, *see* Exec. Auth. To Fill Vacancies, 1 Op. Att'y Gen. 631, 633-34 (1823), making it more venerable than the much more recent practice of intrasession recess appointments. *See Mistretta v. United States*, 488 U.S. 361, 399-400 (1989); *INS v. Chadha*, 462 U.S. 919, 944-45 (1983). We should not dismiss another branch's longstanding interpretation of the Constitution when the case before us does not demand it.